**BLUMENFELD DEVELOPMENT CORPORATION**

v.

**CARNIVAL CRUISE LINES, INC.**

Civ. A. No. 86–4608.

United States District Court, E.D. Pennsylvania.

Sept. 25, 1987.

---

Ronald L. Panitch, Maureen C. Kassner, Philadelphia, Pa., Alan S. Nadel, Roberta Jacobs-Meadway, for plaintiff.

Arthur H. Seidel, Nancy A. Rubner, Harriet M. Sinton, Seidel Gonda Goldhammer & Abbott, P.C., Philadelphia, Pa., Arnold B. Calmann, Ira J. Hammer, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GILES, Judge.

### I. INTRODUCTION

On August 1, 1986, Blumenfeld Development Corporation (hereinafter BDC) filed a single count Complaint seeking a declaratory judgment that BDC's use of "Carnival Club and Design" does not infringe the trademark rights of Carnival Cruise Lines, Inc. (hereinafter Carnival). Complaint ¶ 30.

On September 9, 1986, Carnival filed its Answer and Counterclaim, together with a motion for a preliminary injunction.

On September 9, 1986, the parties appeared before this court and the court decided that the preliminary injunction hearing should be combined with the trial on the merits, after expedited discovery.

After the preliminary injunction hearing, this court rendered a Bench Opinion in favor of defendant, also the counterclaim

plaintiff, which opinion is incorporated herein by reference. The following amplifies the reasons already given to the parties.

## II. FINDINGS OF FACT

### A. *Complaint*

1. Blumenfeld Development Corporation (BDC) alleged in its Complaint that it was engaged in the business of providing "real estate development services" under the mark "Carnival Club and Design." Complaint ¶ 6.

2. It is clear that the gravamen of BDC's claim was its use of the word "carnival" in connection with a proposed hotel to be called Carnival Club Hotel and Casino.

3. Review of BDC's use of its alleged mark "Carnival Club and Design" shows that the word "Club" is *de minimis* in comparison to the word "carnival" and that the word "carnival" is dominant.

### B. *Witnesses*

4. Jack Blumenfeld (Blumenfeld) is a principal of all of the named plaintiffs in this action and is directly and primarily responsible for their respective corporate and business actions.

5. Allan Feingold is a principal of all of the named plaintiffs in this action.

6. Andrew Sutor is the general manager of BDC's proposed hotel casino.

7. Phyllis Kaufmann is an attorney and professional consultant who consulted with Jack Blumenfeld on the choice of a name for the proposed hotel casino.

8. Clark Doran is the project manager for the development of the proposed hotel casino.

9. Marc Orlow, Esquire is an attorney who worked for the law firm that represented BDC, Blumenfeld and Feingold personally, and the companies and partnerships with respect to the corporate matters such as the formation and dissolution of companies.

10. Joseph Fusco, Esquire is an Atlantic City attorney who represents Blumenfeld, his companies and partnerships including BDC with respect to license applications before the New Jersey Casino Control Commission.

11. Karl Spivak, Esquire is a trademark attorney who conducted trademark searches and prepared papers for filing in the United States Patent and Trademark Office for BDC.

12. Lawrence Polillo is the architect employed by BDC with respect to the proposed hotel casino.

13. Daniel O'Leary who designed a number of signs for the proposed casino, is an officer of Ad-Art, a company that designs and builds signs.

14. Thomas Falkowski works in Jack Blumenfeld's offices on tasks assigned by Blumenfeld. These have included editing the publication "Newswire" and preparing financial packages.

15. Noel Mayo, an exterior graphics and aesthetics consultant, is employed by BDC and/or Blumenfeld with respect to the proposed hotel casino.

16. Stanley Faye, a consultant with respect to interior design, is employed by Blumenfeld and/or BDC with respect to the proposed hotel casino.

17. Thomas Powderly, a professor at Brandywine College in Delaware, teaches travel and tourism and has previously worked as a travel agent. He was permitted to give opinion testimony.

18. Lynn Stelle is a travel agent, whose principal experience has been with "affinity groups." He has had limited experience as a retail travel agent. He was permitted to give opinion testimony.

19. Robert W. Burchell, a Professor at the Rutgers Center for Urban Policy Research, was retained by BDC for the preparation and analysis of a survey. He has had no training with respect to consumer behavior, marketing, and/or marketing research. He was permitted to testify about the survey.

20. Steven Salmore, who has a doctorate in Political Science, was retained by BDC for the preparation and analysis of a survey. He has had no training with respect to consumer behavior, marketing,

and/or marketing research. He was permitted to testify about the survey.

21. Ted Arison is the Chairman of the Board of Directors and founder of Carnival.

22. Micky Arison is the President of Carnival.

23. Robert Dickinson is the Senior Vice President for Carnival who has been principally responsible for Carnival's marketing and advertising since the early 1970's.

24. Lawrence Winson is the General Counsel of Carnival.

25. Ellen Levenson is a paralegal employed by Carnival.

26. David Carey is a Professor of Marketing at the Wharton School of Business, University of Pennsylvania, who previously was a Vice President at the Scott Paper Company where he had responsibility for acquisitions, marketing and other such matters for more than 15 years. He testified on marketing, confusion regarding the subject marks, Carnival's nationwide reputation, and the business risk to Carnival resulting from the use by BDC and Messrs. Blumenfeld and Feingold of their proposed marks.

27. Donna Thomas, President of Will Travel, Inc., a travel agency which has three offices in the Philadelphia suburbs which employ more than 30 people, of which a minimum of 16 are full time travel agents. She is also the owner-operator of the Will Travel School, Richboro, Pennsylvania. She testified as both a fact witness and expert witness for Carnival.

28. Ivan Ross is a Professor at the University of Minnesota who specializes in consumer psychology and who testified as an expert with respect to surveys and consumer psychology for Carnival.

### III. CARNIVAL CRUISE LINES

A. *Background and Corporate History*

29. Carnival Cruise Lines began its operations in March, 1972 (predecessor Carnival), as a wholly-owned subsidiary of AITS, Inc. (AITS), a publicly held corporation that packaged group and individual tours.

30. Ted Arison was President of the predecessor Carnival.

31. The name "Carnival" was chosen because "Carnival" was used by AITS in conjunction with other AITS travel and entertainment offerings.

32. The predecessor Carnival chartered its ship, the "Mardi Gras," from another subsidiary of AITS.

33. The predecessor Carnival's very first brochures prominently displayed the mark and tradename "Carnival" and "Carnival Cruise Lines" on the front page of the brochures.

34. On the first sailing of the "Mardi Gras" in 1972, there were slot machines on board.

35. Ted Arison, then President of predecessor Carnival, incorporated Carnival under the laws of Panama in November 1974.

36. On December 14, 1974, Carnival purchased the ship "Mardi Gras" from an AITS related organization. AITS ceased use of the name "Carnival Cruise Lines," and Carnival became the only authorized user of that name.

37. Carnival continued the operations of the predecessor Carnival without interruption and the employees of the predecessor Carnival became employees of Carnival.

38. In January, 1975, Carnival opened a full casino on board the "Mardi Gras."

39. Ted Arison, Chairman of the Board of Carnival and Robert Dickinson, Senior Vice President of Carnival, testified without contradiction that Carnival was the first cruise ship in the United States to offer full casinos on seven-day cruises.

40. The ship board casino featured slot machines, blackjack, roulette, crap tables, and a wheel of fortune.

41. The casino on board the "Mardi Gras" was a casino which was similar to land-based casinos such as those found in and offered at the hotel-casinos in Atlantic City and Las Vegas.

42. On February 7, 1976, "The Empress of Britain," a sister ship of the "Mardi Gras," was chartered by Carnival on an

exclusive basis and commenced service as the "Carnivale," the second ship in Carnival's fleet.

43. The "Carnivale" featured a full range of services, including a casino.

44. When the ships "Festivale," "Tropicale," "Holiday," "Jubilee" and "Celebration" subsequently joined Carnival's fleet and commenced service, in the years 1976 through 1987, they each featured a casino.

45. In the year ending November 30, 1976, Carnival carried more than 73,000 passengers, which represented substantial annual growth over the prior year; and Carnival's ships had a passenger occupancy rate of "more than 100%."

46. "More than 100%" occupancy is achieved when customers use additional upper or roll away beds in their cabins, resulting in more than two persons occupying a single room.

47. Carnival has continued to exceed 100% passenger occupancy in every year since 1976, notwithstanding the addition of five ships to Carnival's fleet since 1976, each of which has a greater passenger capacity than Carnival's initial two ships, the "Mardi Gras" and the "Carnivale."

48. In 1977, the ship "S.A. Vaal" was chartered by Carnival on an exclusive basis and the ship was refitted under the supervision of Carnival.

49. In 1978, this ship began service as the third ship in Carnival's fleet under its new name "Festivale."

50. Carnival's President, Ted Arison, in 1978 ordered the construction of a new cruise ship for Carnival for delivery in 1982 to be named the "Tropicale."

51. In 1983 Carnival ordered three new ships with a projected cost of almost one half billion dollars for delivery in 1985, 1986 and 1987. The names selected for these ships are "Holiday," "Jubilee," and "Celebration."

52. In an effort to continue the growth and expansion of Carnival's business, on May 26, 1984, Carnival commenced a program of three- and four-day cruises in addition to its seven-day cruises.

53. In July, 1985, the ship "Holiday" was delivered and commenced service.

54. In July, 1986, the ship "Jubilee" was delivered and commenced service.

55. In March, 1987, the seventh ship in the Carnival fleet, the "Celebration," was delivered and commenced service.

56. Carnival has announced its order for a new eighth ship which is to be delivered in 1989.

57. Carnival has entered into an arrangement, in conjunction with The Continental Cos., an operator of over 50 hotels in the United States, whereby Carnival and Continental will manage and operate the new Sardi's Broadway Hotel & Casino which is to be built in Atlantic City.

58. Carnival was asked to join in the operation of the new Sardi's Broadway Hotel & Casino because of Carnival's extensive experience in the travel and entertainment market, and in developing, structuring and operating its cruise ships, which feature amenities and services which parallel those of hotel casinos in Atlantic City.

B. *Carnival's Marketing and Promotional Efforts*

59. In June, 1974, the predecessor Carnival adopted its "Fun Ship" marketing concept.

60. As early as June 1, 1974, promotional brochures began to market Carnival Cruise Lines as the owner of the "Fun Ship" Mardi Gras. Again, the trade names "Carnival" and "Carnival Cruise Lines" were prominent in public and trade advertising.

61. In 1974, these brochures were distributed to travel agents throughout the United States.

62. Carnival continued to develop and expand Carnival's "Fun Ship" marketing concept through the distribution of promotional brochures to travel agents nationwide which prominently displayed "Carnival" and advertised and promoted Carnival's fun, resort, entertainment and travel activities which included ranging from the full casino, and night club shows.

63. By 1975, Carnival had begun arranging its specially developed "Fly Aweigh" travel packages that combined both an air trip to Miami and passage on one of Carnival's cruises in a single package price.

64. Carnival Tours, Inc., a Florida corporation (hereinafter Carnival Tours), was formed to qualify with the Air Traffic Conference of America (ATC) and the International Air Traffic Association (IATA) to issue airline tickets for Carnival's combined packages.

65. Carnival, in conjunction with arrangements through Carnival Tours, expanded its special "Fly Aweigh" program and has annually increased its passengers and revenues.

66. Since the formation of Carnival Tours, advertising and promotional programs were managed by Carnival and the costs thereof were shared by Carnival and Carnival Tours.

67. These "Fly Aweigh" brochures have prominently displayed "Carnival."

68. Carnival's "Fly Aweigh" program has grown from more than 90 cities in 1981 including the northeastern cities of Philadelphia, Allentown/Bethlehem/Easton and Wilkes Barre/Scranton, Pennsylvania; Newark, New Jersey; New York City; Hartford, Connecticut; Baltimore, Maryland; and Washington, DC, to more than 165 cities today.

69. Carnival does not feature the names of the various rooms on its ships as part of and marketing of its travel, entertainment and vacation services and packages.

70. Carnival has devoted enormous amounts of resources including millions of dollars to the advertising, marketing and promotion of its operations, entertainment packages and services.

71. Carnival's advertising expenditures are summarized in the chart below for the fiscal years starting December 1, 1977:

| Year | Actual Advertising Expenditures Exceeded |
|------|------------------------------------------|
| 1978 | $ 1,255,000 |
| 1979 | 1,780,000 |
| 1980 | 2,380,000 |

| Year | Actual Advertising Expenditures Exceeded |
|------|------------------------------------------|
| 1981 | $ 4,600,000 |
| 1982 | 7,715,000 |
| 1983 | 9,095,000 |
| 1984 | 14,240,000 |
| 1985 | 18,420,000 |
| 1986 | 25,075,000 |
|      | $ 84,560,000 |

The 1987 budget for advertising is $33 million.

72. In *each* of the last five years, Carnival's actual expenditures have *exceeded* its advertising budget.

73. These expenditures provide overwhelming evidence of Carnival's substantial and increasing commitment to the growth, enhancement, and maintenance of its goodwill and reputation.

74. The advertising budget does not include the following additional promotional items: public relations expenses, marketing department employee salaries, presentations and seminars for travel agents, promotional travel and entertainment, telephone expenses, shipping and postage expenses.

75. Carnival commenced its marketing campaign with the distribution of brochures advertising its first cruise in March 1972, and with the retention of advertising agencies at that time.

76. The 1972 brochures prominently displayed the mark and tradename "Carnival" and "Carnival Cruise Lines."

77. In 1974, Carnival's brochures were distributed to travel agents throughout the United States.

78. Throughout the 1970s, Carnival continued to distribute its brochure on a nationwide basis.

79. Since 1974, Carnival has placed advertisements in the *Travel Agent* and *Travel Weekly*, which are two of the major weekly trade publications received by travel agents. Advertisements in these publications emphasize the gambling facilities on Carnival's ships.

80. Examples of the nationwide newspaper and print advertising by Carnival are the newspaper advertisements that were

published in *The Philadelphia Inquirer, The New York Times, The Star Ledger* (Newark, New Jersey), the *Bergen County Record* (Bergen County, New Jersey), the *Washington Post,* the *Los Angeles Times,* the *Chicago Tribune,* the *Dallas Times-Herald,* the *Boston Globe,* the *Cleveland Plain Dealer,* the *Detroit Free Press,* the *Milwaukee Journal,* the *Newsday* (Long Island, New York), the *Pittsburgh Press,* the *St. Louis Post-Dispatch,* and the *Hartford Courant.*

81. Carnival has advertised and continues to advertise in a large number of newspapers from Pennsylvania, New York, New Jersey, Delaware, Maryland, Washington DC, and Connecticut, including the *Albany Times Union,* the *Allentown Call Chronicle,* the *Asbury Park Press,* the *Baltimore Sun,* the *Bergen County Record,* the *Bethlehem Globe-Times,* the *Binghamton Sun,* the *Easton Express,* the *Erie Times/News,* the *Fairfield County Dailies,* the *Harrisburg Patriot, Long Island Newsday,* the *New Haven Register,* the *New York Daily News,* the *New York Post,* the *New York Times,* the *Philadelphia Inquirer,* the *Pittsburgh Press,* the *Rochester Post,* the *Rochester Democrat,* the *Scranton Times,* the *Stamford Advocate,* the *Star Ledger* (Newark), the *Syracuse Herald,* the *Washington Post,* and the *Wilkes Barre Times.*

82. Since 1977, Carnival has augmented its marketing by distributing a monthly publication entitled "Carnival Capers" to travel agents throughout the United States and currently distributes more than 29,000 copies on a monthly basis.

83. Carnival's "Carnival Capers" contains, *inter alia,* updated information as to Carnival's entertainment packages and services, information as to new ships, information on free promotional cruises for travel agents and complimentary letters from travel agents.

84. For example, the June 1977 "Carnival Capers" issue contains an article entitled "I'm a Little Bit Country," the August 1977 issue contains an article entitled "The Nifty Fifties Go to Sea," the April 1977 issue contains an article entitled "It's a Girl," and the November 1977 issue contains an article entitled "Free Cruise to Nowhere for Travel Agents."

85. The distribution of "Carnival Capers" is further evidence of the widespread distribution of advertising and promotional materials by Carnival since 1977.

86. Carnival has also printed specialty brochures to market particular aspects of its services, such as the "Your Honeymoon Cruise" brochure.

87. In early 1984, Carnival committed itself to a major expansion of its advertising by accepting a proposal from McFarland & Drier, a Miami-based advertising agency, for a nationwide television advertising campaign.

88. Kathie Lee Johnson (now Kathie Lee Gifford), who was a backup co-host for ABC's "Good Morning America" television program, was retained to be the Carnival spokesperson in the spring of 1984. The filming of the new television commercial began in June 1984.

89. The mark "Carnival" is prominently featured in these nationwide television commercials, which first aired in July 1984.

90. Initially, the advertising aired on the nationwide network newscasts of ABC, NBC and CBS in the morning, and the nationwide network newscasts of ABC and CBS in the evening.

91. The list of cities in which Carnival's television commercials have appeared covers all of the major cities and television markets in the United States.

92. Commercials appeared during nationwide television broadcasts including broadcasts from television stations in Philadelphia, Wilmington, Baltimore, Washington, New York, Hartford and Boston.

93. Television advertising also aired on episodes of the "Love Boat" program on the ABC network.

94. Since July 1984, additional commercials have been prepared and distributed and Carnival continues to use nationwide network television advertisements.

95. Carnival reinforces its advertising and marketing efforts through personal

visits to travel agents by Carnival sales representatives which efforts commenced at least as early as 1973.

96. These representatives, who are full time employees of Carnival, distribute promotional materials, answer questions, talk to groups of potential customers organized by the travel agents, and show promotional films in an effort to further increase Carnival's business and promote the goodwill and reputation of Carnival.

97. These efforts, which continue to date, have contributed to Carnival's increase in sales and the number of consumers who choose Carnival's vacation or entertainment packages and services.

98. Today, Carnival has more than fifty such representatives who cover the entire United States. Each of these representatives promotes Carnival and visits as many of the travel agencies and agents as is possible in their respective territories.

99. There are currently two representatives responsible for New Jersey, two for Pennsylvania, two for Delaware, Maryland and Washington DC, and five for New York.

100. In addition, there is a staff in Miami that supports the representatives by answering phone calls directed to the representatives and providing information to the travel agents who call these representatives.

101. Carnival does a substantial business in group sales. For example, church and civic organizations working through travel agents reserve blocks of rooms on Carnival's ships and then sell the space to their members.

102. Carnival provides specific materials to travel agents to help them in arranging for the booking group sales.

103. These groups provide their own mailings to their members which promote Carnival's cruises and which provide articles regarding Carnival, thus augmenting Carnival's own marketing and advertising.

104. Sales and marketing organizations reserve group block space as an incentive or reward to sales people and publicize Carnival to their organization in advertising the incentive program.

105. Starting in the late 1970s and continuing through 1985, Carnival entered into agreements to have one of its ships sail on one or more occasions from one or more of the following ports during the spring and summer: Boston, Philadelphia, Baltimore, and Norfolk, Va.

106. These cruises are referred to as "Outport" cruises because they leave from ports other than the Florida ports used for Carnival's other cruises.

107. The Outport sailings are generally arranged in conjunction with an organization that commits its own funds to the advertising of the Outport sailing. For example, Cruise International, an organization involved in providing travel, entertainment and vacations, promoted the cruises from Philadelphia in 1984 and 1985.

108. These Outport sailings have further increased public awareness of Carnival in the mid-Atlantic states.

109. Carnival has augmented its advertising budget by engaging in cooperative advertising with airlines and travel agencies since 1975.

110. Carnival has engaged in cooperative advertising and marketing with most of the major airlines in the United States.

111. In 1986, Carnival shared the cost of printing a brochure with Eastern Airlines that promoted Eastern as the airline for Carnival's Fly Aweigh cruise.

112. Carnival also co-hosts receptions and informational meetings for travel agents with airlines.

113. Carnival has also entered into cooperative advertising with major travel agencies such as American Express and Liberty Travel.

114. Carnival enters into trade agreements with travel agencies, radio stations and television stations in which it offers a discount on a cruise in return for advertising exposure.

115. From 1984 through today, Carnival entered into a trade agreement with AT & T for its "opportunity calling" program, a

special program which provides AT & T customers with the opportunity to purchase various goods and services at a discount, based upon the customer's use of AT & T's long distance services.

116. As a result, information about Carnival's cruises has been distributed nationwide as part of AT & T's opportunity calling catalogues to all of AT & T's customers.

117. In 1986, other Carnival trade agreements resulted in publicity on "Post Raisin Bran" boxes and on "Close Up" toothpaste boxes.

118. Carnival has also entered into hundreds of trade agreements with local television stations, radio stations and travel agents. For example, in 1984 and 1986, Carnival entered into trade agreements with WWDB in Pennsylvania, WHAS–TV in Washington DC, and WTTG–TV in Washington DC. Each of these local stations agreed to mention Carnival on the air and/or provide further mention of Carnival in newspapers and other publicity materials in return for a discount on a Carnival cruise that could be offered as a contest prize.

119. Carnival sells many items with its name that are purchased by its customers and give further exposure to the Carnival mark.

120. Carnival sells T–shirts, sweatshirts, mugs, and caps.

121. Carnival has previously sold address books.

122. From time to time, Carnival distributes a variety of logo items to its customers, particularly on special and/or first time inaugural cruises.

123. Carnival uses a number of items on board its ships which are taken by passengers. For example, sugar packets, jelly packets and sugar substitute packets with the Carnival mark are often removed by passengers.

124. Other items taken by passengers from their rooms which display Carnival are "Welcome Aboard" brochures, and "Do Not Disturb" signs.

125. Carnival also distributes and sells postcards of its ships that identify the ships as Carnival's ships.

126. Carnival uses cards in its bars and restaurants that use its logos and are carried off by passengers.

127. Carnival distributes materials to travel agents nationwide for use in customer displays, as point of sale aids, and to otherwise promote Carnival.

128. Carnival regularly distributes a color brochure containing all of the necessary information for booking cruises during a year to more than 29,000 travel agents nationwide.

129. Carnival printed more than 4,000,-000 copies of its 1985 ¾ day and fleet brochures and distributed all but approximately 1,000 copies of those brochures.

130. Carnival printed more than 5,800,-000 copies of its ¾ day and fleet 1986 brochure and distributed all but approximately 1,000 copies of that brochure.

131. It is Carnival's understanding, based upon feedback from sales representatives, visits to travel agents, and the quantity of brochures requested and distributed that many of the brochures are further distributed to potential customers.

132. Carnival distributes a sales manual to aid travel agents in selling Carnival's cruises.

133. The Carnival brochure entitled "How About a Cruise" is specifically aimed at the competition from land based resorts and that brochure, in various forms, has been used by Carnival since 1978.

134. Carnival distributes "Carnival Capers" monthly to travel agents nationwide.

135. Carnival's name and mark are further disseminated in the marketplace through the use of its ships, name and mark on television shows. An episode of "The A–Team" was filmed on board one of Carnival's ships and Carnival was identified by name on the show.

136. Through the efforts of Carnival's public relations firm, Carnival is written about, mentioned in the media, and promot-

ed in numerous newspapers and trade journals.

137. *Casino World,* a casino industry newsletter, noted the fact that Carnival hosted the gala for "Partners for Youth" in its September 1986 issue and listed Carnival as among ten cruise lines offering cruises out of San Juan in its October 1986 issue.

138. *Casino Chronicle,* a weekly publication on the casino industry, mentioned in its March 2, 1987 issue that Carnival was building a new hotel on the site of the Cable Beach casino in the Bahamas.

### C. Growth of the Business

139. By December 30, 1986, Carnival had carried in excess of two million passengers since operations began in 1972, more than 1.4 million passengers since 1981, and more than 750,000 passengers in the last two years.

140. The chart below summarizes Carnival's revenues on a fiscal year basis:

| Year | Combined Revenue Exceeded |
|------|---------------------------|
| 1981 | $   153,000,000 |
| 1982 | 203,000,000 |
| 1983 | 212,000,000 |
| 1984 | 228,000,000 |
| 1985 | 271,000,000 |
| 1986 | 375,000,000 |
|  | $ 1,437,000,000 |

141. These revenues are further evidence of Carnival's prodigious sales and substantial presence in the marketplace, and attest to Carnival's nationwide goodwill and reputation.

142. Approximately 239,000 people from the states of New Jersey, New York, Pennsylvania, Delaware, Connecticut, Maryland, Massachusetts, District of Columbia, Rhode Island, West Virginia and Virginia have taken cruises on Carnival ships over the last five years.

### D. Undisputed Sole Use of Carnival

143. Donna Thomas, Carnival's retail travel agent expert witness, testified that she was unaware of any other company that provided travel, resort and entertainment services that used the name "Carnival." The court credits that testimony as accurate and uncontradicted.

144. Travel agents, including those within Donna Thomas' offices, identify "Carnival" as Carnival Cruise Lines and vice-versa.

145. Lynn Stelle, BDC's expert, was unable to identify any other entities that used "Carnival" in the travel/entertainment/vacation field except for Carnival Cruise Lines.

146. Tom Powderly, a teacher at Widener University College who has worked in travel agencies and teaches in a program for travel agents, was unable to identify any other entities that used "Carnival" in the travel/entertainment/vacation field except for Carnival Cruise Lines.

147. Carnival has obtained an assignment of the rights of its predecessor parent corporation AITS, to certain federally registered trademarks: European Carnival, Oriental Carnival, Hawaiian Carnival and Majorcan Carnival.

148. Carnival has instituted Cancellation Proceedings in the Patent and Trademark Office against Allstate Bus Corp., the owner of registration number 1,191,848, registered March 9, 1982 for "Carnival Travel Club" for arranging and conducting tours. An answer to the Petition for Cancellation was due to be filed on or before March 10, 1987. No answer was filed and notice of default was entered on April 20, 1987. There was no evidence that this mark has ever received widespread promotion or was in current use.

149. Gulf and Western, in a letter to Carnival, has represented that it does not intend to file the necessary papers this year to maintain the registration of the mark "Merengue Carnival."

150. With respect to third party uses of the word "carnival," the evidence shows that dissemination of advertising materials is limited to the immediate geographic areas of the business use.

### E. Strength of the Carnival Mark and Effectiveness of Marketing and Promotional Efforts

151. Based upon Carnival's growth in size as measured by the number of ships

that it operates, the number of passengers it carries, the geographic scope of its passenger base, and its revenues, Carnival's continued advertising and marketing expenditures, and the nature and geographic scope of Carnival's various types of advertising and marketing, it is clear that Carnival has established both nationwide recognition and a nationwide reputation for its mark and services in the travel, resort and entertainment market and that reputation is enjoyed in the geographic and trade markets from which the Atlantic City casino draws customers.

152. BDC's survey tends to confirm Carnival's recognition and reputation for Carnival's marks and services in the Atlantic City customer region.

## IV. BLUMENFELD DEVELOPMENT CORPORATION

A. *Background and Corporate History*

153. Until 1983, BDC was an inactive corporation owned by Jack Blumenfeld and Allan Feingold.

154. In or about 1983, Jack Blumenfeld and Allan Feingold acquired property in Atlantic City using BDC as the owner of the property.

155. On May 30, 1985, BDC applied to the Casino Control Commission for a license to lease certain property for parking facilities to a hotel casino in Atlantic City.

156. On July 22, 1985, BDC made a license fee payment of $100,000 to the Casino Control Commission.

157. On July 26, 1985, BDC filed a fictitious name certificate listing "Carnival Club Hotel & Casino" as a fictitious name for BDC.

158. On August 26, 1985, BDC filed a trademark application with the Patent and Trademark Office for "Carnival Club and Design" for services described as "real estate development services, namely hotels and casinos."

159. On March 3, 1986, Jack Blumenfeld and Allan Feingold executed corporate documents and I.R.S. dissolution forms for the purpose of dissolving BDC and trans-ferring the real property owned in Atlantic City to Jack Blumenfeld and Allan Feingold, BDC's shareholders.

160. BDC has no financial records after March, 1986.

161. On or about May 30, 1986, two months after BDC was liquidated and dissolved, BDC forwarded an amendment to its trademark application in the Patent and Trademark Office representing that its services had changed and that BDC was engaged in the "planning and laying out of hotels and casinos for others." This amendment was filed notwithstanding the fact that BDC had purportedly transferred its entire interest in the Atlantic City property and project to Blumenfeld and Feingold and had liquidated and dissolved.

162. Carnival Equities (USA) was formed as a New Jersey limited partnership on November 29, 1985 by Jack Blumenfeld and Allan Feingold, when a limited partnership certificate was executed for CE/USA by Jack Blumenfeld.

163. The certificate was not filed with the New Jersey Secretary of State until March 14, 1986.

164. The original purpose of the CE/USA limited partnership was to own land on which the hotel casino would be built and thereupon lease it to Carnival Club Hotel Associates (CCHA).

165. On or about March 27, 1986 a financial prospectus for CE/USA was completed as part of an effort to raise equity financing towards the development of the Atlantic City property from foreign investors.

166. The CE/USA prospectus was not to be distributed in the United States.

167. CE/USA was going to use the proceeds of the offering of limited partnership interests to pay off the mortgage and other liens on the property in Atlantic City, pay some of the costs incurred by the general partners in acquiring the land, and then advance its remaining funds to Carnival Club Hotel Associates for the development of the Atlantic City property.

168. Once the property was developed, CE/USA would have the option of exchang-

ing its interest in the land with CCHA for a 10% interest in CCHA, which is a general partnership that was formed by Jack Blumenfeld and Allan Feingold as general partners to construct and own the Carnival Club Hotel Casino.

169. In the event that the New Jersey Casino Control Commission failed to approve the financial and corporate structure wherein CE/USA would partially fund CCHA, then the general partners, at their option, could purchase CE/USA's interests.

170. At the time of the first offering of limited partnership units in CE/USA in March, 1986, the land was subject to a note for approximately $17.5 million and the general partners were obligated to pay 34% of the funds received from the offering to a foreign sales agent, Harry Tao.

171. In the original offering, $6.5 million was to be used to pay expenses incurred by the general partners in acquiring the property.

172. Thus, if the first offering had been completely successful, CE/USA would have had less than $16 million (of a total of $60 million) to contribute towards the cost of developing the property.

173. The foreign Sales Agent for CE/USA sold only 134 units worth $670,-000 prior to the expiration of the first offering on or about October 1, 1986.

174. Thereafter, a second offering was made under a new prospectus for investors for CE/USA, dated December 5, 1986, which contain several significant differences in the structure of the offering.

175. Under the second offering, an offshore corporation was to be formed in the event that the Casino Control Commission disapproved of the partnership form of fund raising or required limited partners to qualify individually for a casino license.

176. As of this date, deeds transferring title to the property from BDC to Blumenfeld and Feingold, and from them to Carnival Equities have not been filed.

177. In March, 1987, BDC sought to amend its application for a license to lease property that it has pending before the Casino Control Commission to name CE/USA and CCHA as joint applicants. The amendment states that BDC transferred its interest in the property in March, 1986.

178. Under the proposed corporate structure Carnival Development Corporation (CDC) will be the operator of the hotel casino.

179. All of these partnerships and entities, Blumenfeld Development Corporation, Carnival Equities (USA), and Carnival Casino Hotel Associates, together with J & A Management Corporation, Carnival Development Corporation, and Carnival Equities (U.S.A.), Ltd., are owned and/or controlled by Jack Blumenfeld and Allan Feingold. They are considered a single entity for these proceedings because of their interrelatedness.

### B. *Choice and Evolution of the Name "Carnival"*

180. During the summer of 1984, Phyllis Kaufmann suggested the name "Carnival" and Jack Blumenfeld made the final decision with respect to selection of the name "Carnival" for the proposed hotel casino. At the time Kaufmann made the suggestion, she was aware of Carnival Cruise Lines and was very friendly with Katy Lee Johnson who was making television advertisements for defendant Carnival.

181. Among the names that were considered, in addition to Carnival, were "Palace," "Sand Castle," and "Americana." These names are associated with existing hotel and/or entertainment and/or vacation facilities in Atlantic City and/or outside of Atlantic City.

182. After selection of the name Carnival in or about October, 1984, Karl Spivak, a patent and trademark attorney who was retained by BDC, conducted a trademark search which revealed use of the word "carnival" by persons including Carnival.

183. The name and extent of Carnival's operations, amenities or services were not determined.

184. No legal opinion was obtained at that time as to whether BDC's proposed use of the word carnival would conflict

with anyone else's marks including Carnival's marks.

185. Blumenfeld and his associates considered use of the name "Carnival Carnival" but decided not to use the name because Circus Circus, a Las Vegas hotel/casino, might consider such a use to be a violation of its trademark rights.

186. At the suggestion of Karl Spivak, BDC's trademark counsel at that time, Blumenfeld and his associates considered adding another word to "carnival" to attempt to distinguish Blumenfeld's use of "carnival" from other established uses as revealed by Spivak's trademark search, including Carnival.

187. At the recommendation of Marc Orlow, an outside attorney employed by BDC, the word "Club" and the club design were added to the name "Carnival" in the belief that such use would distinguish Blumenfeld's use of the word "carnival" from other uses, including that of defendant Carnival.

188. No later than November, 1984, the name "Carnival Club Hotel Casino" and a logo, the "Club" design, had been decided upon by Jack Blumenfeld as the name and logo for the facility.

189. In November, 1984, Jack Blumenfeld publicly announced the fact that BDC intended to build a new hotel casino in Atlantic City which would operate under the name "Carnival Club Hotel & Casino" and which would target the "family market." A report of this was carried in *The Press* in Atlantic City on November 9, 1984.

190. Although the word "club" and the club design allegedly were added to the word "carnival" to attempt to distinguish the hotel casino name from other uses of the word "carnival," the name was designed to emphasize the word "carnival" in a large letter stylistic design and the word "club" was comparatively small, thereby emphasizing the word "carnival."

191. In 1985 or early 1986, as part of the planning for the hotel casino, BDC and Blumenfeld consulted with Ad-Art, a company located in California that designs and manufactures outdoor signs.

192. During the course of those discussions with Ad-Art, BDC decided that the signs appearing on the outside of the proposed casino hotel should emphasize the word "carnival" and a new club logo, and not include the word "Club" thereby leaving only the word "Carnival" on the signs.

193. No later than December 26, 1985, a schematic drawing for a proposed sign which did not include the word "Club" was prepared.

194. In February, 1986, Ad-Art proposed signs for use in locations shown on the schematic drawings.

195. One of these signs which was composed of only the word "Carnival" and did not include either the word "club" or the club logo, was to be placed on the roof of the proposed casino hotel and was to be seventeen and one-half (17½) feet high by one hundred fifty-two (152) feet long, large enough to be visible from the Atlantic City Expressway, a distance of several miles.

196. Thereafter, artist's renderings were prepared for these signs that depict the proposed signs in color. None of these signs include the word "Club." At trial, Blumenfeld promised that the word "Club" would be placed on the sign and in all advertising along with the word "Carnival" and would be of equal size. However, a proposed "Carnival Club" sign has not been submitted for approval to the Atlantic City Planning Board.

197. The schematic drawings of the signs showing use of just the word "carnival" and/or the word "carnival" with the new logo design were submitted to the Atlantic City Planning Board in July, 1986.

198. On March 27, 1986, the CE/USA prospectus was issued, on its cover the word "carnival" appears in large letters without the word "club."

199. It is clear from the evidence that BDC's advertising emphasis will be upon "carnival" and not "club" and that the casino will be referenced in the public mind as "Carnival."

C. *Promotion re: Blumenfeld's CCHC*

200. There has already been significant publicity concerning BDC's proposed hotel

casino, even though construction on the building has not commenced.

201. BDC has retained a public relations firm, headed by Bernard Popick, to prepare certain announcements with respect to the proposed hotel casino.

202. Popick has distributed press releases of the payment of a deposit on the casino license fee and the ceremonial groundbreaking to newspapers in New Jersey and Philadelphia.

203. Reports of these events have also been carried by national newspapers, such as the *Wall Street Journal* and *New York Times.*

204. News of the Carnival Club Hotel & Casino was intended to reach national newspapers in an effort to publicize the project and thus help in the efforts to raise funds for the project.

205. A brochure was prepared in or about March, 1986, to provide information about the proposed hotel casino project for distribution to potential investors, contractors and other interested people.

206. Colored drawings of various parts of the proposed hotel casino facility were also prepared.

207. T-shirts were prepared and distributed that advertised the project.

208. BDC has used the Carnival Club Hotel & Casino stationery in correspondence to promote the hotel casino.

### D. *Proposed Hotel Operations and Marketing*

209. The Atlantic City Casino Association regularly tracks various information of interest to Atlantic City hotel casinos.

210. The number of annual visitors to Atlantic City is demonstrated by the following figures:

| YEAR | Number of Visitors (millions) | Bus Visitors (millions) | Car Visitors (millions) |
|---|---|---|---|
| 1980 | 13.8 | 3.9 | 9.8 |
| 1981 | 19.0 | 7.4 | 11.4 |
| 1982 | 22.9 | 9.6 | 13.0 |
| 1983 | 26.3 | 11.6 | 14.3 |
| 1984 | 28.4 | 12.7 | 15.4 |
| 1985 | 29.3 | 13.3 | 15.7 |
| 1986 | 29.8 | 13.2 | 16.3 |

211. With the leveling off of growth in the number of annual visitors, the competition for visitors and among casinos is likely to become increasingly fierce.

212. The officials of BDC and its related entities who are responsible for the marketing of the hotel casino are Jack Blumenfeld and Andrew Sutor.

213. Blumenfeld and Sutor agree that they intend to market the proposed hotel casino as a "family" oriented operation and that they intend to target the "family market."

214. Other hotel casinos have also indicated their intent to target the family market, e.g., Showboat.

215. The Showboat Hotel & Casino, which opened in April 1987, has prominently indicated its intent to target the "family market."

216. The Tropicana Hotel & Casino is in the process of adding facilities that will target this "family market."

217. In addition, BDC and its related entities also intend to target the meeting and convention market.

218. In support of this, BDC and its related entities are planning one of the largest convention facilities in Atlantic City.

219. Sutor has identified the key feeder markets (i.e., the markets which will allegedly provide most of their patrons) for the proposed hotel casino facility as Atlantic City, South Jersey, Phiadelphia, Northern New Jersey, New York, and DelMarVa which includes portions of Delaware, Maryland and Virginia.

220. Neither Blumenfeld nor Sutor are sure whether they will advertise in the *Star Ledger,* which is one of New Jersey's largest papers, or in the New York papers. Present plans call for CCHC to be advertised in Philadelphia.

221. They say that they will not rule out advertising in publications in Northern New Jersey, New York, and DelMarVa.

222. Sutor developed a part of the BDC marketing plan which is to "fish where the fish are."

223. This is a slogan that is intended to convey a plan to primarily advertise for customers within Atlantic City with the intention to reach potential customers after they have reached the vicinity of Atlantic City.

224. Sutor also intends to attract at least 100 better gamblers per day, sometimes referred to as high rollers, who are willing to bet a minimum amount of money. Sutor has not set the minimum yet.

225. BDC's proposed facility will also have a gourmet restaurant and other amenities and services designed to attract these better players.

### E. *Proposed Trademark*

226. On August 26, 1985, BDC filed a trademark application with the Patent and Trademark Office for "Carnival Club and Design" for services described as "real estate development services, namely hotels and casinos," which indicated that the trademark had first been used in commerce on March 7, 1985.

227. This trademark application made no claim to any goods or services related to the field of travel, entertainment, vacations and resorts.

228. The trademark application remains in the name of BDC.

229. On May 30, 1986, an amendment to its trademark application was filed on behalf of BDC deleting its original description of services and substituting in its place the following description of services: "planning and laying out of hotels and casinos for others."

230. As amended, the trademark application still made no claim to any goods or services related to the field of travel, entertainment, vacations and resorts.

231. Sutor is not sure whether BDC's related entities are continuing to use the design as shown on the trademark application.

232. The design shown on the proposed signs that have been prepared for the proposed hotel casino are different from the design shown on the trademark application.

233. The title of the original CE/USA prospectus, completed in or about March, 1986, used the word "carnival" and a design, and failed to make any reference to or use of the word "club."

## V. LIKELIHOOD OF CONFUSION

### A. *Identity of Mark/Similarity of Portrayal of Mark*

234. Carnival has been known principally by the tradename "Carnival" based on its use of the tradename "Carnival Cruise Lines" and "Carnival" and its overwhelming advertising and marketing for many years.

235. Since the fall of 1985, Carnival's newspaper advertisements and other advertisements have featured the name "Carnival" separate and apart from the references to Carnival Cruise Lines.

236. Travel agents refer to Carnival simply by the name "Carnival."

237. Casino industry publications refer to Carnival simply by the name Carnival.

238. BDC and its related entities have used the word "carnival" totally independently of the word "club" in references to the proposed hotel casino construction.

239. In October, 1984, in BDC's first marketing plan, Sutor referred to the proposed hotel casino solely as the "Carnival" hotel casino.

240. One of the signs which is to appear on the proposed hotel casino, depicts just the word "carnival" and not the word "club," and was last revised on December 26, 1985.

241. Renderings and plans of signs based upon use of only the word "carnival" were presented to BDC sometime after February 16, 1986, by Dan O'Leary of Ad-Art.

242. Mr. O'Leary testified that part of the intent underlying these signs was that if the logo could not be remembered, people would remember just the word "carnival."

243. Mr. O'Leary indicated that he hopes that the largest of these signs will be the number one visual spectacle in Atlantic City.

244. The minutes of the planning meetings for the proposed hotel casino indicate consideration by BDC and its related entities of use of the word "carnival" without the word "club" for various types of marketing programs under the titles "carnival caravan," "slot carnival" and "carnival cash."

245. Sutor has indicated that the "carnival caravan" idea was aimed at potential bus patrons.

246. This suggests that it would be used outside of Atlantic City.

247. Another marketing idea involving the use of the word "carnival" was the idea to obtain a phone number that would be referred to as "800–CARNIVAL."

248. Some of the pages of the original brochure prepared by BDC and its related entities feature the use of just the word "carnival."

B. *Identity of Product* (Amenities etc.)

249. Both parties to this action offer products that feature the same essential amenities.

250. Indeed, cruise ships are often referred to as floating resorts.

251. The atmosphere conveyed in Carnival's brochures are typified by the following language in the 1986 brochure: "Having fun is what a Carnival cruise is all about."

252. BDC has stated that "Customers of 'Carnival Club' will be offered one main amenity—fun."

253. BDC has announced its intention to market its proposed hotel casino as an ongoing festival with a full range of entertainment including jazz bands, string bands, production shows including magic acts and a wide variety of food.

C. *Identity of Market and Competition*

254. The broadest definition of the travel, vacation, entertainment market is that it includes all people who have discretionary income to spend on travel, entertainment and vacations.

255. Hotel casinos and cruise lines appeal to substantially the same market.

256. BDC is a member of the Hotel Sales & Marketing Association International, which specifically includes in the same membership category hotels, motels, inns, resorts, clubs and cruise ships.

257. Although Carnival's "Fly Aweigh" offerings for three-day cruises start with prices as low as $395 from Philadelphia, the market is not limited to those people who have that amount of money to spend. People who have less discretionary income to spend might choose the Carnival experience by mistakenly opting to visit a hotel casino in Atlantic City, because they perceive a relationship and/or association between Carnival and BDC's hotel casino.

258. Carnival has a nationwide market of the adult population that has money to spend on discretionary travel, vacation, and entertainment options.

259. BDC and its related entities have indicated that they intend to market the proposed hotel casino to families, high rollers, and to businesses and other entities for conventions and meetings. As a practical matter, this includes a substantial portion of the adult population.

260. BDC commissioned a study by Laventhol and Horvath (L & H Study), an accounting and consulting firm that specializes in the Atlantic City market, to analyze the market and potential business of the proposed hotel casino in or about 1984.

261. The analysis indicates that Atlantic City was successful in attracting vacationers and business meetings following World War II because of its location and because of convention hall.

262. Further, as the Caribbean destinations and cruise alternatives became popular in part as a result of the decrease in the cost and increase in popularity of flying, annual visitor volume to Atlantic City declined.

263. In the mid–1970s, Atlantic City was stagnating as a result of competition from other resort and vacation destinations.

264. Prior to the passage of the amendment to New Jersey's Constitution that allows casino gambling, there was a substan-

tial decrease in the number of hotel rooms available in Atlantic City from its peak in the 1950s.

265. As the number of hotel rooms and other facilities in Atlantic City increase, Atlantic City will become even more competitive with other cities and resort destinations for conventions and other types of business meetings.

266. The study concludes that the market demand in Atlantic City consists of three elements: (1) gaming related; (2) vacations; and (3) conventions.

267. Convention and business meetings are important during Atlantic City's off-peak periods and "shoulder" periods.

268. Atlantic City's off-peak and shoulder periods are from labor day until June 15, which substantially overlaps with Carnival's peak marketing period.

269. In the first and second CE/USA prospectuses that were prepared in or about March, 1986 and October, 1986, BDC and its related entities identified their competition as the other hotel casinos in Atlantic City, the hotel casinos in Las Vegas, Puerto Rico, the Bahamas, other hotel casinos outside of the United States, racing, jai-alai, and other gambling, vacation and entertainment alternatives.

270. It further states that "as Caribbean resorts developed, cruise ships became more popular, airfares decreased and other cities developed major convention centers, Atlantic City's competitive edge diminished and annual visitor volumes declined."

271. The prospectus also indicated that if casino gambling was approved in Florida, that event could have an adverse effect on the business of the proposed hotel casino notwithstanding the fact that Florida is not a neighboring state.

272. In the second CE/USA prospectus that Blumenfeld prepared in or about October, 1986, after the commencement of this litigation, BDC and its related entities stated that they "will face intense competition from other casino/hotels in Atlantic City, from casino/hotels located in Nevada, USA, Puerto Rico, the Bahamas and other locations outside the USA, and from forms of wagering such as parimutuel racing, jai-alai, lottery games and other gambling activities, as well as other vacation and entertainment alternatives."

273. Atlantic City and Caribbean cruise lines compete for the same consumer discretionary dollar.

274. The Holiday Hotel and Casino in Las Vegas used the words "Fun Ship" as part of their advertising for their hotel casino.

275. Holiday Hotel and Casino implicitly recognized the competition between hotel casinos and cruises for the discretionary dollar when they discontinued the use of the words "Fun Ship."

276. The Showboat Hotel and Casino, which is designed and built to resemble a cruise ship opened in Atlantic City in April, 1987. One brochure features language stating that the hotel was built like a cruise ship.

277. In the brochures that were distributed on request prior to opening, the Showboat specifically compared itself to cruise ships.

278. Brochures and at least one advertisement depict the hotel on the bow of a cruise ship breaking through ocean waves.

279. The Showboat brochures demonstrate the competitiveness between the hotel casinos in Atlantic City and cruise ships for the consumers' discretionary dollar.

280. Carnival has specifically compared itself to Las Vegas hotel casinos in its advertising.

281. For many years, Carnival has published a brochure entitled "How About a Cruise" which specifically compares the features of a Carnival cruise to the features of a land based vacation.

282. Newspaper articles and magazine articles also compare cruises to land based vacations.

283. The overall marketing, advertising, corporate plans and strategy of hotel casinos such as the proposed hotel casino, Showboat and others overlap and crossover with Carnival's marketing, advertising, corporate plans and strategies.

284. There is direct and apparent competition between the operations, services and amenities of Carnival, existing hotel casinos and the proposed CCHC.

285. As a result of Carnival's arrangement with Continental Hotels with respect to the operation and management of Sardi's Broadway Hotel & Casino, Carnival will have an additional presence in Atlantic City thereby reinforcing the fact of competition between Carnival and hotel casinos.

286. Carnival's presence and association with a hotel casino in Atlantic City further increases the substantial likelihood of confusion between the parties' respective use of "Carnival."

### D. *Channels of Trade*

287. Carnival has used virtually every form of both local and nationwide advertising for many years and has spent a substantial amount of money on such advertisements and marketing.

288. BDC admits in its Reply to the Counterclaim, which was subsequently adopted by the other third-party defendants, "that it will advertise its services through the same channels of trade as Carnival Cruise Lines, Inc. once a casino-hotel is operative."

289. It is clear from the market plan of BDC and its related entities that there is a substantial likelihood that the proposed casino hotel will advertise in the same channels of trade as Carnival, although it is quite possible that the advertising of the proposed casino hotel will not be as extensive as that of Carnival.

290. In some papers, the advertisements for Atlantic City hotel casinos and for Carnival or other cruises sometimes appear side by side.

291. At the very least, the Carnival and hotel casino advertisements appear in the same travel sections of newspapers.

292. Because of Carnival's presence in the market, travel agents are likely to assume that resort destinations and suppliers of travel, vacation and entertainment services that include the word "carnival" are somehow associated with or related to Carnival.

293. Consumers will also assume that such entities are related or otherwise associated with each other, and on the basis of experience with one supplier may refuse to use other suppliers that use the same name, even after it is explained to them that the suppliers are not related.

294. It is likely that consumers who are familiar with the name Carnival by virtue of Carnival's advertising and marketing, will associate Carnival with other competitive travel, resort and vacation destinations that use the word "carnival" as part of their names.

295. The flaws in the survey offered by BDC include the following:

a. The principal researchers were neither trained nor experienced in consumer psychology, consumer behavior, marketing, or marketing research.

b. The sample universe was improper because (i) a number of the survey respondents should have been excluded from the sample universe; (ii) the survey failed to include anyone other than ultimate conclusion, e.g., travel agents; and (iii) the geographic definition of the universe was too limited.

c. The survey employed a questionnaire that did not measure the likelihood of or potential of confusion.

d. The researchers obfuscated responses which shed light on the fact that the two companies are in related businesses.

e. The survey conclusions repeatedly misstate and misinterpret the underlying data. This is most frequently done by employing language in the conclusions which is simply not supported by the questions in the survey.

f. There were numerous technical errors in the survey which damage its reliability and validity including (i) the absence of a pretest; (ii) the absence of a validation procedure to assure that the interviews occurred; (iii) the absence of adequate instruction for the interviewers; (iv) the absence of any information as to how the interviewers were trained; (v) the fact that the author of the survey

conclusions did not code the data; and (vi) the fact that different people prepared the questionnaire and the conclusions from the data, i.e., Dr. Salmore designed the questionnaire, and Dr. Burchell prepared the conclusions.

### E. *Actual Confusion*

296. Ellen Levinson, a paralegal who works for Carnival, received a phone call from Ms. Stephanie Sobel shortly after the groundbreaking for the proposed hotel casino in 1986.

297. As reported to Ms. Levinson, Ms. Sobel worked for the American Hotel and Motel Association and indicated that she was calling to find out further information as to the proposed hotel casino and determine whether Carnival was interested in joining the association.

298. This phone call is indicative of at least one instance of actual confusion, even though the hotel casino has not opened as yet, has not even been built, and has engaged in very little promotion and advertising in the United States.

## VI. RISK TO CARNIVAL/EFFECT OF CONFUSION

### A. *Business Risks to Carnival by Blumenfeld Use*

299. The importance of Carnival's developed reputation and the danger posed by Blumenfeld's infringing use of "Carnival Club" is highlighted by the testimony of Micky Arison, the President of Carnival:

> Carnival's unblemished and carefully developed reputation extends to Carnival's casino operations and this reputation is invaluable in light of the corporate and background problems sometimes associated with other casinos. Carnival cannot afford to have its reputation placed in the hands of another such as Blumenfeld, and thereby risk the irreparable harm which might result in the event that there are any problems associated with Blumenfeld's application to the New Jersey Casino Control Commission for a casino license or with Blumenfeld's de-

velopment and/or operation of its hotel casino.

M. Arison Aff. ¶ 24.

300. There is currently a high degree of risk associated with new hotel casinos in Atlantic City because the number of visitors to Atlantic City is no longer growing at any significant rate and thus new casino hotels are forced to compete for the same visitors as the existing hotels.

301. The competition for visitors to Atlantic City between hotel casinos in Atlantic City is likely to increase over the next few years with the additions that are being made to existing hotel casinos, the addition of the Showboat Hotel Casino, and the addition of the Taj Mahal Hotel Casino unless the hotel casinos change their marketing strategy and seek more visitors from greater distances.

302. As the competition for visitors grows, there is an increasing likelihood that one or more of the hotel casinos will experience financial trouble and the attendant bad publicity resulting from such lack of financial success.

303. By way of example, the Atlantis Hotel Casino, which has sought protection under the federal bankruptcy laws, has received considerable attention and negative publicity as a result of that filing, and its financial problems have continued.

304. Carnival has no control over the quality of Blumenfeld's operations of the proposed Carnival Club Hotel Casino.

305. If customers were dissatisfied with the quality of the "Carnival Club" operations, they might attribute the same lack of quality to Carnival, and not only refuse to consider Carnival's travel, vacation and entertainment services and packages but also discourage others from considering Carnival's services.

306. Blumenfeld may offer activities that are incompatible or inconsistent with Carnival's established and valuable reputation, thus further irreparably damaging Carnival.

## VII. CONCLUSIONS OF LAW

1. BDC's use of the name "Carnival Club" and/or "Carnival" directly in-

fringes Carnival's service mark, trademark, and trade name rights and constitutes unfair competition and a "false designation of origin," or "false description or representation" of the Lanham Act:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

■ 2. A trade name is the name used by an organization to identify its business, a trademark distinguishes its goods, and a service mark distinguishes its services. Although a trade name as such is not registrable under the Lanham Act, it is nevertheless protected under the Act. *Railroad Salvage of Conn. v. Railroad Salvage, Inc.*, 561 F.Supp. 1014, 1019 (D.R.I.1983).

3. Section 43(a) of the Lanham Act provides protection for trade names as well as registered and unregistered marks, such as Carnival's common law marks. *Chi Chi's Inc. v. Chi-Mex, Inc.*, 568 F.Supp. 731, 734 (W.D.Pa.1983), *American Diabetes Association v. National Diabetes Association*, 533 F.Supp. 16, 18 (E.D.Pa.1981), *aff'd*, 681 F.2d 804 (3d Cir.1982).

■ 4. "Designation of origin" as used in 15 U.S.C. § 1125(a) is not limited to geographic origin, and embraces designation of source of origin, including trademarks and service marks. *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 160 (1st Cir.1977); *Noone v. Banner Talent Associates, Inc.*, 398 F.Supp. 260, 263 (S.D.N.Y.1975); *Matsushita Electric Corporation of America v. Solar Sound Systems, Inc.*, 381 F.Supp. 64, 67 (S.D.N.Y. 1974).

■ 5. Carnival's trade name and mark are entitled to protection under the Act and under the common law.

■ 6. The two elements required to establish trademark infringement or unfair competition are:

(1) that the trademark owner's mark is distinctive and thus protectible; and

(2) that the second-comer's actions cause a likelihood of confusion among the relevant buyer class. *Chi Chi's, supra*, 568 F.Supp. at 734. Accord, *American Diabetes Ass'n, supra*, 533 F.Supp. at 19–20.

7. Trademark infringement and service mark infringement are governed by identical standards under the Lanham Act and the common law of both Pennsylvania and New Jersey. *American Diabetes Ass'n, Inc. v. National Diabetes Ass'n*, 533 F.Supp. 16, 18, n. 1 (E.D.Pa.1981), *aff'd*, 681 F.2d 804 (3d Cir.1982); *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 822 (D.N.J.1980).

8. Carnival's trade name and mark is arbitrary.

9. A mark is inherently distinctive if it is arbitrary, fanciful or suggestive. *American Diabetes Ass'n, supra*, 533 F.Supp. at 19.

■ 10. An arbitrary or fanciful mark is a word specifically coined to be a trademark with no descriptive or even suggestive connotation. Marks of this nature are clearly entitled to maximum protection available under the trademark law. *Chi Chi's, supra*, 568 F.Supp. at 735.

■ 11. Suggestive marks are those marks which require mature thought and imagination to determine the significance of the mark as it relates to the goods. *In re Rank Organization, Ltd.*, 222 USPQ 324 (TTAB 1984).

12. Arbitrary and suggestive terms can be protectible upon their first adoption and use without proof of secondary meaning. *American Diabetes Ass'n, supra,* 533 F.Supp. at 19; *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1364 (D.N.J.1981); *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 822 (D.N.J.1980).

13. If a mark is merely descriptive, then secondary meaning must be proved in order for the mark to be protectible. *American Diabetes, supra,* 533 F.Supp. at 19; *Chi Chi's, supra,* 568 F.Supp. at 734.

14. The test of descriptiveness is whether the word as used conveys to the consumer the characteristics, functions, uses or qualities of a product or service. *Victoria Station, Inc. v. Clarefield, Inc.,* 458 F.Supp. 199, 202 (W.D.Pa.1978). 1 *McCarthy, Trademarks And Unfair Competition,* § 11.5 (2d Ed.) at 442 (1984).

15. The "merely descriptive" language of the Lanham Act means that the descriptive term is one that is commonly used to describe the service. *American Diabetes Ass'n,* 533 F.Supp. at 19.

16. Carnival's use of its "Carnival" trade name and mark does not tell the potential customer what its services are, therefore it does not meet the descriptive test.

17. Carnival's trade name and mark are meaningless as they relate to a cruise line and thus are unique, arbitrary and strong for those types of services. *American Diabetes Ass'n, supra,* 533 F.Supp. at 19; *Estate of Presley, supra,* 513 F.Supp. at 1364; *Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694, 700 (2d Cir. 1961).

18. Assuming *arguendo* that Carnival's trade name and mark are not arbitrary or suggestive, Carnival's trade name and mark meet the test for secondary meaning and thus are entitled to protection.

19. "Secondary meaning is buyer association." *American Diabetes Ass'n, supra,* 533 F.Supp. at 19.

20. "Secondary meaning exists when consumers seeking a trademark assume that the product it labels comes from a particular source." *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983); *Estate of Presley, supra,* 513 F.Supp. at 1364.

21. In determining whether a trade name or mark has achieved a secondary meaning courts consider:

1) the length and manner of use,

2) the nature and extent of advertising and promotion; and

3) other efforts at creating a conscious connection in the public's mind between the designation and the service.

*American Diabetes Ass'n, supra,* 533 F.Supp. at 19.

22. For over fifteen years Carnival has been using its trade name and mark throughout the nation. Carnival advertises and promotes its trade name and mark to consumers and travel agents heavily throughout the United States, especially the Northeast. As a result, Carnival has achieved enormous success and consequently a nationwide reputation under its trade name and mark.

23. If this court allowed BDC to use the trade name and mark Carnival, BDC would unjustly benefit from the goodwill developed by Carnival among consumers in the travel, resort and entertainment fields. *Wall v. Rolls-Royce of America, Inc.,* 4 F.2d 333, 334 (3d Cir.1925).

24. Carnival has established a secondary meaning for its mark. Carnival contains seven different ships, each sailing at different times with different passengers, but all bearing the Carnival mark. *Scott Paper Co. v. Scott's Liquid Gold,* 589 F.2d 1225, 1228 (3d Cir.1978).

25. Although a distinction is drawn between secondary meaning and likelihood of confusion, proof of one is proof of the other. *Interpace, supra,* 721 F.2d at 465.

26. Carnival's trade name and mark meet the market reputation test and thus are entitled to protection.

27. An unregistered mark is entitled to protection in areas where it was the senior user and has penetrated the market place.

*Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *Natural Footwear Limited v. Hart, Schaffner & Marx,* 760 F.2d 1383 (3d Cir.), cert. denied, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985).

■■■ 28. Carnival is the senior user of the trade name when compared to BDC. The trade name and mark "Carnival" has been used in connection with its services throughout the United States for more than fifteen (15) years.

29. To assess market reputation and penetration, four factors are to be considered:

(1) The volume of sales of the trademarked product;

(2) The growth trends (both positive and negative) in the area;

(3) The number of persons actually purchasing the product in relation to the potential number of customers; and

(4) The amount of product advertising in the area. *Natural Footwear, supra,* 760 F.2d at 1398–99.

30. Applying the *Natural Footwear* factors, it is clear that Carnival's market penetration is nationwide and encompasses Carnival's market penetration and developed reputation in New Jersey, the home of the proposed hotel/casino in Atlantic City, as well as Pennsylvania, the home of BDC.

31. Carnival has demonstrated that there is a likelihood of confusion between Carnival's use of its trade name and mark "Carnival" and BDC's proposed use of the trade name and mark "Carnival."

32. The likelihood of confusion is enhanced by the interrelatedness of the markets in which Carnival and BDC are involved. That is, Carnival ships contain casinos and BDC planned to use the Carnival mark for its casinos.

33. "Likelihood of confusion" is an essential element for both trademark infringement and unfair competition. *Perfectform Corp. v. Perfect Brassiere Co., Inc.,* 256 F.2d 736, 741 (3d Cir.1958), cert. denied, 358 U.S. 919, 79 S.Ct. 287, 3 L.Ed. 2d 238 (1958); *American Express Co. v. Pan American Express International*

*Ltd.,* 509 F.Supp. 348, 351 (E.D.Pa.1981); *Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d 554, 569 (1st Cir.1982).

34. The basic criterion for determining whether trademark or service mark infringement has occurred is whether use of the trademark by a nonowner is likely to cause confusion. If it is determined that the trademark owner and infringer deal in competing goods and services, the court may simply look at the mark itself. If, as in this case, the parties are not engaging in competing lines but there is a close relation to the services being rendered, the court must look at the trademark, the services rendered by both parties and the context of marketing. *Interpace v. Lapp,* 721 F.2d at 460, 462.

35. Likelihood of confusion is determined by viewing the marks from the viewpoint of an ordinary purchaser of the services. *American Express, supra,* 509 F.Supp. at 351.

36. This "likelihood of confusion" standard is lowered to a "possibility of confusion" where, as here, a newcomer such as BDC is entering into a field already occupied by a long-established operation, such as Carnival. *Florence Mfg. Co. v. J.C. Dowd & Co.,* 178 F. 73 (2d Cir.1910). Accord, *Telechron, Inc. v. Telicon Corp.,* 198 F.2d 903, 908–909 (3d Cir.1952).

37. The Third Circuit has identified ten factors to be considered in determining whether likelihood of confusion exists, i.e., whether consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark:

(1) The degree of similarity between the owner's mark and the alleged infringing mark;

(2) The strength of the owner's mark;

(3) The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) The length of time the defendant has used the mark without evidence of actual confusion arising;

(5) The intent of the defendant in adopting the mark;

(6) The evidence of actual confusion;

(7) Whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) The extent to which the targets of the parties' sales efforts are the same;

(9) The relationship of the goods in the minds of consumers because of the similarity of the function;

(10) Other facts suggesting that the consuming public might expect the owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Interpace Corp., supra,* 721 F.2d at 463. *See also, Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 823–824 (D.N.J. 1980); *Trump v. Caesars World, Inc.,* 645 F.Supp. 1015, 1021 (D.N.J.1986).

38. Analysis of these factors requires a finding of infringement and the entry of a permanent injunction against BDC's continued use of "Carnival" and/or "Carnival Club."

39. Courts view with suspicion a trade name or mark which is so close to that of another, that the public may fail to distinguish them.

40. The addition of the subordinate and miniscule word "Club" does not serve to distinguish BDC's mark from that of Carnival's mark and will cause confusion among customers of Carnival.

41. Even if BDC were to use the mark "Carnival Club," it is inevitable that many persons would shorten the name to "Carnival." See *Trump v. Caesars World, Inc.,* 645 F.Supp. 1015, 1022 (D.N.J.1986) ("Inevitably many persons will shorten the proposed Trump name ["Trump's Palace"] to the "Palace"). *Cf. Interpace, supra,* 721 F.Supp. at 463 ("Lapp" and "Lapp Cable" virtually identical); *Victoria Station, Inc. v. Clarefield, Inc.,* 458 F.Supp. 199, 202 (W.D.Pa.1978) ("Victoria Station" and "Victoria Station Mall" nearly identical); *Kraft, Inc. v. Country Club Food Industries, Inc.,* 230 U.S.P.Q. 549, 551 (T.T.A.B.1986) (Philadelphia is dominant portion of "Phila-delphia Brand" and "Philadelphia's Famous Cheesecake").

42. When the dominant portions of two marks sound the same when spoken by consumers, there is likely to be confusion. Any differences in the design of the marks does not dispel this confusion. *Giant Food v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1570 (Fed.Cir.1983).

43. The dominant portion of trademarks will be given greater force and effect. If similar, courts will "conclude that the similarities in appearance, sound and overall commercial impression outweigh the dissimilarities ... and if there is any doubt as to the likelihood of confusion, that doubt must be resolved against the newcomer." *Giant Food, supra,* 710 F.2d at 1571.

44. A person going to a resort hotel on land in Atlantic City named "Carnival Club" or "Carnival" is not likely to think he or she is on a cruise ship; however, it is certainly likely that he or she may think there is a connection between the services and operations offered or the business of the two entities.

45. It is quite likely that people who have been on Carnival cruises, or are contemplating going on a Carnival Cruise, will also visit Atlantic City and stay or gamble at BDC's hotel/casino.

46. That BDC's proposed hotel/casino is located in Atlantic City and Carnival's ships sail out of ports in Miami and Los Angeles has no relevance.

47. Even though BDC's hotel/casino has yet to be built and has engaged in very little promotion and advertising, actual confusion has already occurred. As there is actual confusion at this point, the potential for confusion when BDC's hotel/casino is built, operating and advertising is tremendous.

48. Another type of confusion which is likely to occur is called "subliminal trademark association." *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 486 F.Supp. 414, 428 (S.D.N.Y.1980), *aff'd,* 687 F.2d 563 (2d Cir.1982). *Trump v. Caesars*

*World, Inc.*, 645 F.Supp. 1015, 1022 (D.N.J. 1986).

49. Subliminal confusion has been defined as "defendants' ability to gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's" protected name or mark. *Playboy Enterprises*, 486 F.Supp. at 428.

50. As the second comer, BDC has a duty to choose a mark or trade name so as to avoid all confusion as to the source of origin of its services. *Johnson & Johnson v. Quality Pure Mfg., Inc.*, 484 F.Supp. 975, 980 (D.N.J.1979).

51. If denied injunctive relief, Carnival will have its reputation and goodwill placed in the hands of the plaintiff Carnival entities, whose financial structure and organization have yet to be approved by the New Jersey Casino Control Commission. This is sufficient for a court to enjoin plaintiff from the use of the mark even absent evidence of product inferiority.

52. Injunctions are appropriate in trademark cases where the reputation of the senior user "is left to the mercy of the junior user, whose business policies may not reflect the same sound judgment." *Miss Universe v. Little Miss U.S.A. Inc.*, 212 U.S.P.Q. 423 (N.A.Ga.1980).

53. Carnival is a house mark or umbrella mark which relates to all the services Carnival provides. See 1 McCarthy, *Trademarks and Unfair Competition*, § 9:6, p. 315 (2d Ed.); 1 Gilson, *Trademark Protection and Practice*, § 1.02, pp. 1–11 (1986); 3 Callman, *Unfair Competition, Trademarks and Monopolies*, § 17.15, pp. 59–60 (4th Ed.)

54. The fact that Carnival is a Panamanian corporation and that its casinos only operate outside the United States territorial waters is irrelevant.

55. Where a mark is known in the United States, or where it is advertised in the United States and the acts of an American trademark infringer constitutes unfair competition against the foreign trademark owner, American courts will grant protection. Callman, *Unfair Competition,*

*Trademarks and Monopolies*, § 19.24, p. 75 (4th Ed.).

56. Use by BDC of "Carnival Club" and/or "Carnival" infringes Carnival's common law trademark rights in its "Carnival" marks and constitutes common law unfair competition.

57. In a diversity case, the District Court must apply the choice of law rules of the forum state in determining which state's law applies. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1308 (3d Cir.1978); *Suchomajcz v. Hummel Chem. Co.*, 524 F.2d 19 (3d Cir. 1975).

58. Since Pennsylvania is the forum state, its conflicts rules will be used in choosing which state's common law applies as to the torts of unfair competition and trademark infringement.

59. The law of Pennsylvania or Florida or New Jersey is potentially applicable to this case. Pennsylvania is where BDC has its principal place of business. Florida is where Carnival has its principal place of business. New Jersey is where BDC is incorporated, and where Blumenfeld intends to establish a hotel/casino with the alleged infringing designation "Carnival Club" and/or "Carnival." Injury is likely to occur in all states if BDC uses this designation.

60. The landmark Pennsylvania decision in a tort action choice of law case is *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964). In *Griffith*, the Supreme Court of Pennsylvania abandoned the traditional *lex loci delicti* rule in favor of a more "flexible" approach to choice of law which "permits analysis of the policies and interests underlying the particular issue before the court." *Id.* at 21, 203 A.2d at 805.

61. In *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854 (1970), the court stated that one method in determining which state has a greater interest in the application of its law, is to examine the relevant contacts each state has with the

# 1322

tort. This should not be a mere quantitative counting of contacts, but rather a qualitative determination of which state has the more substantial interest in having its law applied. *Id.* at 566, 267 A.2d at 856. Applying that analysis, the court finds New Jersey law should be applied.

62. New Jersey courts have long protected trademark rights under the doctrine of unfair competition. *American Shops, Inc. v. American Fashion, etc., Inc.*, 13 N.J. Super. 416, 80 A.2d 575 (App.Div. 1951), *cert. denied,* 7 N.J. 576, 83 A.2d 379 (1951).

63. In New Jersey, the common law test for unfair competition and infringement is likelihood of confusion, which is also the test for federal unfair competition. *Perfectform Corp. v. Perfect Brassiere Co., Inc.*, 256 F.2d 736, 741 (3d Cir.1958), *cert. denied,* 358 U.S. 919, 79 S.Ct. 287, 3 L.Ed.2d 238 (1958); *Red Devil Tools v. Tip Top Brush, Inc.*, 50 N.J. 563, 236 A.2d 861, 157 U.S.P.Q. 456, 458 (1967); *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1361–1362 (D.N.J.1981); *Great Atlantic & Pacific Tea Co. v. A & P Trucking Corp.*, 29 N.J. 455, 149 A.2d 595, 597 (1959).

64. New Jersey common law looks to the same ten factors in determining likelihood of confusion as are looked at in determining likelihood of confusion under federal unfair competition. *Caesar's World,* 490 F.Supp. at 823–824.

65. BDC's conduct, including wrongful copying and appropriation of Carnival's mark in direct competition with Carnival, amounts to unfair competition and trademark infringement under New Jersey law.

## VIII. DAMAGES

Because there has been no substantial commercial use by defendant of the name "carnival," no actual damages are probable.

The claim for punitive damages is denied.