**TRANS PACIFIC INSURANCE COMPANY**

v.

**TRANS–PACIFIC INSURANCE COMPANY.**

**Civ. A. No. 90–2531.**

United States District Court, E.D. Pennsylvania.

June 1, 1990.

Victor N. Lea, Philadelphia, Pa., for plaintiff.

Jay E. Mintzer, Philadelphia, Pa., for defendant.

## MEMORANDUM

WALDMAN, District Judge.

Plaintiff, Trans Pacific Insurance Company, seeks a preliminary injunction against defendant, Trans–Pacific Insurance Company, for trademark infringement and unfair competition under 15 U.S.C. § 1125(a), and for state common law unfair competition. An opportunity for hearing and oral argument was provided on May 9, 1990. The court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Trans Pacific Insurance Company is a subsidiary of Tokio Marine and Fire Insurance Company of Japan. Plaintiff was incorporated in the state of New York on January 21, 1982 to provide property and casualty insurance coverage, and its operations are conducted by Tokio Marine Management, Inc., a New York-based affiliate of Tokio Marine and Fire.

2. Since its inception, plaintiff has used the trademark "Trans Pacific Insurance

Company" and has displayed said mark on its stationery, checks, invoices and insurance policies, although it has never attempted to register the mark with the United States Patent and Trademark Office. Plaintiff uses the mark, at least on its stationery, in tandem with the mark "Tokio Marine" and the language "The Tokio Marine and Fire Insurance Co., Ltd. U.S. Branch."

3. Plaintiff is licensed to provide insurance coverage in thirty-one (31) states: Alabama, Alaska, Arizona, Arkansas, California, Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New York, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Utah, Washington and Wisconsin, as well as the District of Columbia.

4. Plaintiff maintains underwriting offices in New York, Los Angeles and Honolulu, as well as service offices in Atlanta, Chicago, Houston and San Francisco.

5. Plaintiff is listed in *Best's Insurance Reports* ("*Best's*") as a provider of workers' compensation insurance.

6. *Best's* is a publication of the A.M. Best Company, a private organization which analyzes and rates insurance companies. It is used as a reference source by regulators, brokers and purchasers of insurance.

7. The 1989 edition of *Best's* gives plaintiff an "A" or "Excellent" rating, its second highest rating. This rating is based upon the rating assigned by *Best's* to plaintiff's parent Tokio Marine and Fire because plaintiff "is not eligible for its own rating as it has an insufficient number of years of representative operating experience."

8. Plaintiff's business consists primarily of issuing workers' compensation policies for American-based subsidiaries of Japanese corporations, notably Seiko, Panasonic and Nissan.

9. Plaintiff is currently studying the market feasibility of writing other lines of insurance in the future.

10. Plaintiff's premiums in the calendar year 1989 were approximately eight million dollars ($8,000,000), reflecting an increase in premium volume of more than eighty percent (80%) since 1985, although representing no more than 1% of the worker's compensation insurance market.

11. Approximately half of plaintiff's premiums are derived from insurance sales in Hawaii and ninety percent (90%) of plaintiff's premiums are derived from sales in five states: Alaska, Hawaii, Illinois, New Jersey and New York.

12. Plaintiff markets its policies through independent brokers, agents and account representatives who deal with corporate executives and risk managers, and does not engage in commercial advertising.

13. Defendant Trans–Pacific Insurance Company was incorporated in the Federated States of Micronesia ("Micronesia") on December 26, 1989. Since March 20, 1990, defendant has operated under the name Trans–Pacific Insurance Company (F.S.M.). "F.S.M." is an acronym for the "Federated States of Micronesia."

14. Prior to December 1989, defendant conducted business for a period of time from Guam and Micronesia under the name "Casualty Risk Insurance Brokerage Co." ("CARIB") and "Medical Liability Purchasing Group, Inc." ("MLPG"), which operated as a wholly-owned subsidiary of CARIB.

15. As of September 30, 1989, CARIB and defendant utilized a Consolidated Financial Statement which reflects three million dollars ($3,000,000) in total premiums.

16. Defendant, using the MLPG name, underwrites medical malpractice insurance and offers casualty insurance under the Trans–Pacific name. Neither entity offers workers' compensation coverage.

17. Defendant primarily markets its policies through direct solicitation throughout the United States. There is no evidence that defendant engages in commercial advertising.

18. Defendant is not licensed to write insurance in any state of the United States or the District of Columbia.

19. Defendant maintains an office address and telephone service in Washington, D.C.

20. Defendant has not attempted to register its mark.

21. Defendant is not listed in *Best's Insurance Reports.*

22. The Indiana Insurance Commissioner initiated fraud charges against MLPG in 1989.

23. On April 5, 1990, the Texas Insurance Commissioner issued a cease and desist order against defendant for soliciting business in that state without a license on and after February 14, 1990.

24. On May 2, 1990, the Kansas Insurance Commissioner issued a cease and desist order against defendant for the unauthorized solicitation of business in that state on April 10, 1990.

25. Plaintiff became aware of the existence of defendant on or about January 26, 1990 when it received an inquiry from Steven Roy, an official in the Department of Community Services of St. Paul, Minnesota, seeking information about a home inspector's liability policy and Certificate of Insurance under the name "Trans–Pacific."

26. Plaintiff received a letter dated February 23, 1990 from R.J. Devine, an insurance and risk management consultant in Wisconsin, enclosing a solicitation of one of his clients from defendant to write insurance for underground storage tanks. Although he was not confused, Mr. Devine opined that defendant's solicitation of business under the "Trans–Pacific" name could cause confusion in the marketplace.

27. On February 24, 1990, plaintiff received a telephone call from Robert Olauson of the Surety Association of America, a national trade association, who asked if plaintiff maintained an office in Washington, D.C., after receiving a package of promotional material from "Trans–Pacific Insurance Company" from Washington.

28. In late February of 1990, plaintiff received a telephone call from John Robeznieks, a Chicago attorney who represents many physicians, who had been asked by clients to "check out" "Trans–Pacific," which had solicited them to write malpractice insurance. After consulting *Best's*, Mr. Robeznieks called plaintiff to ask if it was the company which had made this solicitation. Upon learning that it was not, Mr. Robeznieks indicated that he was not surprised as the premiums seemed "too good to be true."

29. In late March of 1990, plaintiff received a telephone call from Tim O'Neill, a bond broker, with regard to a Certificate of Insurance issued by "Trans–Pacific" in connection with an asbestos abatement project at the Wissahickon School District in Pennsylvania. After consulting *Best's*, Mr. O'Neill called plaintiff to ascertain if it had issued this policy.

30. On March 1, 1990, plaintiff made a written demand upon defendant that it cease and desist from using the "Trans Pacific" mark.

31. On March 7, 1990, defendant's agent responded in writing that the company refused to stop using the name "Trans–Pacific Insurance Company" because it had become a "household name" across the Pacific, an interesting assertion in that defendant had only used the mark for 71 days.

32. On April 13, 1990, defendant's agent wrote to a lawyer for plaintiff that defendant had placed a disclaimer of affiliation with plaintiff by stamping a statement on its "office forms" that "Trans–Pacific Insurance Company (F.S.M.) IS NOT AFFILIATED IN ANY WAY WITH TRANS PACIFIC INSURANCE COMPANY WHICH IS A PART OF TOKIO MARINE AND FIRE GROUP." The defendant presented no evidence that this in fact had been done and the April 13, 1990 letter on defendant's stationery contains no such disclaimer.

33. The only evidence of record on the subject, plaintiff's exhibit 15, suggests that defendant did not adopt the "Trans Pacific" name in December 1989 in bad faith.

## CONCLUSIONS OF LAW

1. A party seeking a preliminary injunction bears the burden of demonstrating that (1) there is a reasonable probability or

likelihood he will succeed on the merits and (2) there is a probability that the party will be irreparably harmed by denial of preliminary relief. When relevant, the court should also consider whether (3) granting such relief will result in greater harm to the other parties and (4) granting preliminary relief is in the public interest. *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987); *Constructors Ass'n of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir.1978).

■ 2. A claim for common law trademark infringement or unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is proven if (1) the trademark owner's mark is distinctive and thus protectable, and (2) the subsequent user's actions cause a likelihood of confusion among the relevant buyer class. *Schutt Manufacturing Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir.1982); *Blumenfeld Development Corp. v. Carnival Cruise Lines, Inc.*, 669 F.Supp. 1297, 1317 (E.D.Pa.1987).

3. For purposes of determining the degree of protection to which a mark is entitled under federal and common law, courts have classified trademarks as either "generic," "descriptive," "suggestive," or "arbitrary and fanciful." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296–7 (3d Cir. 1986).

■ 4. Only "suggestive" and "arbitrary or fanciful" marks are "inherently distinctive" so as to be subject to protection without proof of secondary meaning. *Id.*

■ 5. A mark combining a geographic term with a generic term like "insurance" is descriptive. *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir.1984). "Trans Pacific," as applied to an American subsidiary of a Japanese business whose customers typically are American-based subsidiaries of Japanese concerns, is a geographical mark descriptive of the nature of plaintiff's business and of the market through which it operates. Thus, it is a descriptive mark. *See National Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir.1982), *cert. denied*,

464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *American Diabetes Ass'n v. National Diabetes Ass'n*, 533 F.Supp. 16, 19 (E.D.Pa.1981), *aff'd*, 681 F.2d 804 (3d Cir. 1982). *See also* 3 Callmann, *Unfair Competition, Trademarks & Monopolies*, § 18.15 at 175–6 (4th ed. 1989). This is especially so when the mark is used in tandem with that of the Japanese parent.

6. Plaintiff and defendant do not offer the same lines of insurance and are not in direct competition for business.

■ 7. To prevail on the merits in an action involving the use of similar descriptive marks for non-competing services, the senior user must prove that its mark has acquired "secondary meaning" in the junior user's market and that there is a likelihood of confusion as to the source of the respective services. *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978). The burden is on the plaintiff to prove that its mark had acquired such meaning at the time of its adoption by defendant. *Id.* at 1231.

■ 8. Likelihood of confusion and secondary meaning, although conceptually distinct, are in practice virtually indistinguishable and "proof of one is proof of the other." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983). Secondary meaning exists when consumers viewing a trademark assume that the product it labels or service it represents comes from a particular source, and likelihood of confusion exists where they would probably assume that it comes from a different source who utilizes a similar mark. *Id.; Scott, supra*, at 1229.

9. The Third Circuit has applied ten factors in determining the existence and extent of secondary meaning:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence

of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Scott Paper,* 589 F.2d at 1229. The same factors are used in determining likelihood of confusion. *See Interpace,* 721 F.2d at 462.

9(a). Plaintiff's and defendant's service marks are virtually identical. The mere presence of a hyphen and "F.S.M." in defendant's mark does virtually nothing to differentiate it from plaintiff's mark. The court doubts that F.S.M. connotes the Federated States of Micronesia to anyone but the most ardent geographer and even then, readers could well assume that defendant was associated with other Trans Pacific Insurance companies of which they are aware.

9(b). Plaintiff's mark is a common geographic term and no evidence was adduced from which the court can find that the mark is strong. Indeed, in evaluating plaintiff, *Best's Insurance Reports* concluded that it "is not eligible for its own rating as it has an insufficient number of years of representative operating experience."

9(c). When providing coverage for a corporate work force or when seeking protection against professional malpractice claims or major casualties, the purchaser can be expected to use considerable care given the premium costs and serious potential economic consequences of choosing unwisely.

9(d). The evidence shows that four persons were at least partially confused after defendant began using its mark in late December 1989. Three of the four, however, were seeking to ascertain whether or not plaintiff had made solicitations in fact initiated by defendant and thus, at most, appear to have assumed that plaintiff might have been the source of services offered by defendant. Two of the four reached this conclusion only after consulting *Best's* and discovering a singular listing for "Trans Pacific" in New York.

9(e). The only evidence of record on the subject, an exhibit submitted by plaintiff, suggests that defendant was unaware of plaintiff's existence or use of the "Trans Pacific" mark on December 26, 1989, when defendant adopted it. One reasonably can infer that defendant, a Pacific based company soliciting business across the Pacific, selected the name for obvious reasons similar to plaintiff's. That defendant may operate with disregard for the licensing requirements of the various states and several potentially applicable state and federal laws, does not establish knowledge or bad faith on its part in selecting the name under which it operates.

9(f). There is little evidence of record of actual confusion during the time defendant has used this mark. Further, the confusion which has occurred does not reflect a spontaneous association by potential insureds of plaintiff's name with defendant's service or product but rather the decision by *Best's* to list plaintiff and not to list defendant in its reference book.

9(g). The parties do not engage in commercial advertising and, from the limited evidence of record, appear to market insurance through different channels. While defendant appears generally to engage in direct solicitation, some of its target customers may be expected to consult with the same type of insurance consultants and brokers who advise plaintiff's potential customers.

9(h). The parties targeted by plaintiff are industrial and commercial concerns with a need for workers' compensation coverage. The parties targeted by defendant appear to be firms and public authorities engaged in hazardous activity and professionals subject to negligence and malpractice claims.

9(i). The relationship of the plaintiff's and defendant's products in the minds of the public is substantial because of the obvious similarity of function.

9(j). Although plaintiff and defendant do not write the same lines of insurance, it would be reasonable for the buying public to assume that plaintiff had expanded into the lines of insurance that defendant markets, to the extent that potential consumers are aware of plaintiff at all.

10. Defendant's use of a disclaimer of affiliation alone would not be sufficient to avoid liability for trademark infringement. *See United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir.1981); *Brockum Co., Division of Krimson Corp. v. Blaylock*, 729 F.Supp. 438, 445 (E.D.Pa.1990).

11. The evidence of record does not establish that "Trans Pacific" has acquired sufficient secondary meaning to make it distinctive. The similarity of the parties' names and services alone does not establish secondary meaning. A mark acquires secondary meaning when "by long and extensive use and advertising by one person in the sale of his goods or services [it becomes] so associated in the public mind with such goods or services that it serves to identify them and distinguish them from the goods or services of others," *Liberty Mutual Insurance Co. v. Liberty Insurance Co. of Texas*, 185 F.Supp. 895, 903 (E.D.Ark.1960). Likewise, instances of actual confusion alone do not establish secondary meaning. *Bank of Texas*, 741 F.2d at 788. This is particularly so when the confusion occurs from consulting a commercial directory that lists only one of two firms with similar names. *See Id.*[1] The record does not establish that any significant number of persons in the relevant consuming public recognize plaintiff's name or associate it with plaintiff's services. A mark with virtually no meaning cannot have secondary meaning.

12. The record does not substantiate a sufficient likelihood of confusion among potential consumers to justify injunctive relief. There is no evidence of record that anyone receiving a solicitation or obtaining insurance from the defendant assumed that he was dealing with the plaintiff. It is only upon researching or investigating the source of a given policy or solicitation that some people may be confused because of the decision of *Best's*, a private publication, to list plaintiff and not to list defendant. That confusion has been and can be dissipated with a single telephone call. State regulators appear to have had no problem distinguishing between plaintiff and defendant. What confusion has occurred did not result from this mark's association with a particular service or product over a period of time in the mind of the buying public. *Bank of Texas*, 741 F.2d at 787.

13. A senior common law mark user, moreover, is entitled to protection only in the specific geographic areas in which he can prove that he has established a sufficient presence or reputation to warrant it by the time of the first use of a similar mark by the junior user in those trade areas. *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1394, 1397–8 (3d Cir.1985); *Blumenfeld Development Corp. v. Carnival Cruise Lines, Inc.*, 669 F.Supp. at 1318; *Steak & Brew, Inc. v. Beef & Brew Restaurant, Inc.*, 370 F.Supp. 1030, 1037 (S.D.Ill.1974); 2 J. McCarthy, *Trademarks and Unfair Competition* § 26.10 (2d ed. 1984).

14. The Third Circuit has identified four factors for use in determining market presence: (1) the party's volume of sales in the area; (2) the rate of sales growth or decline experienced by the party in the area; (3) the number of persons buying the party's goods or services in relation to the total potential customer base in the area; and, (4) the amount of the party's advertising in

---

**1.** This is not to say that listings in trade directories or publications can never create sufficient familiarity to establish secondary meaning. There is no evidence in this case, however, that

plaintiff's listing in *Best's* has done so. The court notes that other companies listed in *Best's* engage in substantial advertising and promotion of their names and services.

the area. *Natural Footwear Ltd.,* 760 F.2d at 1398–9.[2]

14(a). Plaintiff produced no evidence of its sales volume. It produced evidence of its total annual premiums, but not the number of policies or transactions that generated them or where sales were made. The significance of the sales volume can be evaluated properly only when information is provided about the cost per unit or income per transaction. *Id.* at 1399 n. 35. From the record, it is impossible to ascertain whether plaintiff's premiums result from numerous sales or a few transactions with a handful of customers, or where specific sales were made. There is evidence of the percentage of its business that plaintiff does by state but this is no substitute for evidence of volume. That plaintiff, for example, does 10% of its business in a given state may mean that it had ten sales there (10% of 100 total sales), reflecting very little market penetration, or 100,000 sales (10% of 1,000,000 sales), reflecting a significant market presence.

14(b). Plaintiff produced evidence of growth in its annual premiums over the past five years, but no evidence of the number of increased sales, if any, this represents. Plaintiff's sales may have decreased while it raised its premiums for all one can tell from the record. The rate of growth has little probative value without evidence of sales volume. *Id.* at 1399.

14(c). Plaintiff produced no evidence of the number of customers it has or the number of potential customers in any given area.

14(d). Plaintiff has not done any commercial advertising in any region.

15. The plaintiff has not established that its mark had acquired secondary meaning in any state or trade area at the time of defendant's first use of its mark.

■ 16. On the current record, there is not a reasonable probability or substantial likelihood that plaintiff will succeed on the merits of its infringement and unfair competition claims. [Except for the interstate commerce requirement, the state common law of unfair competition is identical to the Lanham Act, including the requirement of proof that a user's mark has acquired secondary meaning in the alleged infringer's market. *See Standard Terry Mills, Inc. v. Shen Manufacturing Co.,* 803 F.2d 778, 780 n. 4 (3d Cir.1986); *Ginger Group, Ltd. v. Beatrice Companies, Inc.,* 678 F.Supp. 555, 561 (E.D.Pa.1988).]

■ 17. Plaintiff is not likely to suffer irreparable harm if its motion for a preliminary injunction is not granted. Once a party has made the requisite showing of trademark infringement and unfair competition, the probability of loss of goodwill constitutes irreparable harm sufficient to warrant injunctive relief. *Premier Dental Products Co. v. Darby Dental Supply Co.,* 794 F.2d 850 (3d Cir.1986), *cert. denied,* 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986), *reh. denied,* 479 U.S. 1062, 107 S.Ct. 945, 93 L.Ed.2d 995 (1987). Plaintiff, however, has not made such a requisite showing. Plaintiff has not proven any likely loss of business or goodwill at this point.

■ 18. Granting a preliminary injunction will result in greater harm to the defendant than the harm plaintiff will suffer in the event a preliminary injunction is not granted. If preliminarily enjoined, defendant effectively could be deprived permanently of the use of its chosen name. It would be costly and complicated for defendant to change names and then switch back if it ultimately prevails on the merits. Plaintiff has not demonstrated that it will sustain any real damage in the several months it will take to fully litigate this matter to conclusion.

■ 19. Granting a preliminary injunction on this record does not advance the public interest. Arguably, the public interest would be served if those who direct defendant's affairs were enjoined from engaging in any off-shore direct solicitation

---

**2.** Natural trading areas do not necessarily parallel state boundaries. *Id.* at 1398 n. 34. Presence on a state-by-state basis, however, may well be the best measure for a product or service the marketing of which is controlled and highly regulated by authorities on a state-by-state basis.

insurance business, at least in states where they are not licensed. The Lanham Act, however, does not provide a vehicle for achieving such a result to a party who cannot prove that its mark has acquired secondary meaning in any trade area. Moreover, the evidence of record strongly suggests that the risk defendant's operatives pose to the public interest would not be mitigated for long merely by forcing them to change the name under which they conduct business. The record indicates that those with primary responsibility for protecting the public in this regard, the state insurance regulators, can move promptly to enjoin defendant's unlicensed activities—within 49 days in Texas and within 21 days in Kansas.

Accordingly, plaintiff's motion for a preliminary injunction will be denied.