**ESSIE COSMETICS, LTD., Plaintiff,**

v.

**DAE DO INTERNATIONAL, LTD., JMRS, Inc. and New High Glass, Inc., Defendants.**

No. CV 92–5126 (JBW).

United States District Court, E.D. New York.

Dec. 24, 1992.

Darrell L. Olson, Knobbe, Martens, Olson & Bear, Newport Beach, CA, for plaintiff.

Stanley R. Goodman, Goodman & Saperstein, Garden City, NY, for defendants.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

Plaintiff sells nail polish to the salon trade in a bottle and cap distinctive for their simplicity. Defendant is about to enter this market using a practically identical container. A motion for a preliminary injunction must be granted.

## I. FACTS

Fingernails are big business. Even a casual stroller on the streets of New York City will notice the recent proliferation of nail salons. Professional nail care in Metropolitan New York has become a Korean specialty. Susan Edmiston, *Self-selected for Success; 1986 Year of the Woman Immigrant*, Working Woman, July, 1986, at 53. The entrepreneurial spirit of this immigrant group is reflected in estimates that from 450 to 600 nail salons are owned by Koreans in the five boroughs. *See* Alair A. Townsend, *The Old American Dream With a Special Korean Polish*, Crain's N.Y.Bus., Apr. 17, 1989, at 11. Their quick, inexpensive approach to manicures has "brought manicures to the masses," attracting customers that might not go to expensive salons. Pat Widder, *Koreans Nail Down Share of New York's Manicures*, Chic.Trib., Aug. 21, 1989, at C1. In the United States, there are estimated to be more than 200,000 nail salons. *Gamble Pays Off for Nail–Care Catalogue King*, Crain's Detroit Bus., Jul. 20, 1992, at Sec. 1, p. 23..

At the hearing on the motion for a preliminary injunction it was estimated that millions of adult women in the New York Metropolitan area spend as much as $500 a year on their nails. Sales of nail polish run well into the billions. *Id.* One recent report of the cosmetic industry reveals that the popularity of nail salons has caused a dramatic decline in retail purchases of nail care products. *Drug and Cosmetic Industry*, June 1992, at 24.

Plaintiff, Esther Weingarten ("Essie"), has taken advantage of this boom in nail care. Since 1987, she has been selling nail polish in a square clear glass bottle with a simple cylindrical white cap to nail salons and to beauty supply houses who in turn sell to nail salons. She currently offers one hundred and forty-seven colors with such catchy names as "Bit a Sweet Mauve" and "Hot Fudge Sundae." Her bottle has

no identifying label, only a small circular sticker on the underside indicating the color and the trade name "Essie Cosmetics." Adherence to the dictum of celebrated architect Mies van der Rohe that "less is more," has led her to commercial success. Since she designed the bottle and cap, over twenty million bottles of the polish have been sold, with sales totaling approximately $20 million through the end of 1992. She estimates, without contradiction, that she has captured between forty and sixty percent of the national nail salon market. Employing the slogan, "For the salon whose own name is enough," plaintiff also sells her bottle for private labeling to salons and retail outlets. Such sales constitute about 10% of her business.

Essie has spent $250,000 in promoting her polish in industry magazines, in which her bottle is prominently displayed, as well as at trade shows. Approximately twenty-five percent of her business is with Korean nail salons in the New York Metropolitan area.

To establish that the public associates her bottle design with Essie Cosmetics, plaintiff has submitted survey evidence conducted at nail trade shows. Interviewees with purchasing authority were shown an unlabeled Essie bottle and cap. When asked who they believed sold the product, more than sixty-five percent identified Essie by name. Seventy-five percent of those who identified the polish as Essie's gave packaging design as the reason. This survey was appropriately conducted. A recent unsolicited magazine article stated, "There's no mistaking that square, labelless little bottle that's seen in nail and hair salons worldwide." *How to Polish Your Act,* Mademoiselle, March 1991, at 78.

Defendants are Dae Do International Ltd., a manufacturer and distributor of cosmetics products, JMRS, Inc. (a newly formed corporation) and New High Glass, Inc. (supplier of the bottle to Dae Do). They are about to enter the nail salon market with a polish packaged in a bottle and cap indistinguishable from Essie's with the name "Cile" imprinted in small letters on one side on a small transparent peel-off label. Even the form of defendants' label is designed not be noticed, mimicking the Essie labeling tactic of placing printed source identity on the underside so as not to interfere with the stark simplicity of Essie's container. Other competitors (including Almay and Chanel) package nail polish in similar, but clearly different, square bottles with distinctive caps.

Defendants concede they possess the bottles, shipped from Florida to New York. They are ready to offer their product nationwide.

The hearing established that Koreans operating nail salons, like many first and second generation immigrant groups in this country, tend to prefer to deal with members of their own ethnic group. The Korean identity of defendant Dae Do thus makes appropriation of trade dress particularly significant.

Plaintiff seeks a preliminary injunction under the Lanham Act, 15 U.S.C. § 1125(a), for common law trade dress infringement, and under New York's anti-dilution statute, N.Y.Gen.Bus.Law § 368–d. Defendants ask for a declaratory judgment that they may enter the market with their bottle design.

## II. LAW

### A. *State Law Claim*

■ New York's anti-dilution statute, N.Y.Gen.Bus.Law § 368–d, on its face seems to apply. It reads:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Nevertheless, reflecting an "absence of judicial enthusiasm for the anti-dilution statutes," New York has interpreted this provision to exclude cases where infringement is claimed by a direct competitor selling a similar product. *Allied Maint. Corp. v. Allied Mechan. Trades, Inc.,* 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). *See also Business Trends Analysts v. Freedonia Group, Inc.,* 650 F.Supp. 1452, 1458 (S.D.N.Y.1987); *SmithKline Beckman v. Proctor & Gamble Co.,* 591 F.Supp. 1229, 1246 (N.D.N.Y. 1984), *aff'd,* 755 F.2d 914 (2d Cir.1985). According to New York's highest court, in enacting section 368–d the legislature sought to remedy the evils associated with a "cancer-like growth" of dissimilar prod-

ucts feeding upon the reputation of an established name, not the public confusion associated with similar products or services. *Allied Maint. Corp. v. Allied Mechan. Trades, Inc.*, 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977).

Since this decision was originally issued, the Second Circuit has decided that N.Y.Gen.Bus.Law § 368–d is applicable to competitors as well as to noncompetitors. *See Nikon, Inc. v. Ikon Corp.*, 1993 WL 47802, *5, 1993 U.S.App. Lexis 3245 at *15 (2d Cir.1993). That ruling, however, has no effect on the outcome of this case which is favorable to plaintiff.

### B. *Lanham Act Claim*

■ Plaintiff has a valid Lanham Act claim. 15 U.S.C. § 1125(a). The statute provides protection against false designation and description of origin. It reads:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The interesting new legal problem posed by this case is whether the *absence* of a description or representation on a product can be misrepresented. Where, as here, the simplicity of design itself speaks of origin without explicit attribution, copying that design is, under the statute, a false designation of origin.

### 1. Timeliness

■ In a trademark infringement action, a court may grant injunctive relief "even before defendant actually opens the business," so long as the threatened act of defendant is "imminent and impending." J. Thomas McCarthy, *2 Trademarks and Unfair Competition*, § 30.5 at 470 (2d ed. 1984). *See e.g., Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.*, 662 F.Supp. 203, 205 (S.D.N.Y.1987) (prelimi-

nary injunction granted over defendant's argument that the claim was premature where defendant had printed labels and cartons and sent one bottle to a potential distributor). New High Glass's shipment of five hundred bottles from Florida to Dae Do in New York meets the "use in commerce" test.

### C. *Preliminary Injunction*

■ A court may issue a preliminary injunction where the moving party demonstrates "both possible irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits making them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985). Both elements can be established by a showing that there is a likelihood of "an appreciable number of ordinary prudent purchasers" being confused or misled about the source of the product. *Western Pub. Co., Inc. v. Rose Art Industries, Inc.*, 910 F.2d 57, 59 (2d Cir.1990) (quoting prior decision).

#### 1. Irreparable Injury

■ "[T]he probability of loss of goodwill constitutes irreparable harm sufficient to warrant injunctive relief." *Trans Pacific Ins. Co. v. Trans–Pacific Ins. Co.*, 739 F.Supp. 240, 247 (E.D.Pa.1990). The unique nature of the trademark's or trade dress function in representing such an intangible asset "as reputation and good will" means that irreparable harm is almost always found where probability of confusion exists. *Playboy Enterprises, Inc. v. Chuckleberry Pub. Inc.*, 486 F.Supp. 414, 429 (S.D.N.Y.1980), *aff'd*, 687 F.2d 563 (2d Cir.1982). A showing of actual diversion of customers is not required, only the danger of confusion. *Id.* If a defendant is given time to move into the same competitive market, the plaintiff would likely lose control of its reputation and good will. *Id.*

#### 2. *Likelihood of success on the merits or sufficiently serious questions going to the merits making them a fair ground for litigation with the balance of hardships tipping in the movant's favor.*

### a. Functionality

Trade dress is protectible under the Lanham Act if it is nonfunctional and has acquired secondary meaning. *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc.*, 735 F.Supp. 141, 143 (S.D.N.Y.), *aff'd*, 916 F.2d 76 (2d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991). It acquires secondary meaning when the purchasing public associates that dress with a single product or source, rather than only with the product itself. *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71 (2d Cir.1985).

A bottle or other product design is functional if it is essential to its purpose. *In re Morton Norwich Products, Inc.*, 671 F.2d 1332, 1342 (Cust. & Pat.App. 1982). The design is essential to the product's purpose if 1) denying its use to others will deprive them of the ability to compete in the marketplace effectively or 2) consumer preference is so strong that "no other shape will do." *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 21 (7th Cir.1992). The burden is on defendants to prove a design functional. *Le Sportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 76 (2d Cir.1985).

That burden is difficult to meet in the case of containers. As indicated by the Court of Customs and Patent Appeals, a "bottle can have an infinite variety of forms and designs and still *function* to hold liquid. No one form is *necessary* or appears to be 'superior.'" *In re Morton Norwich Products, Inc.*, 671 F.2d 1332, 1342 (Cust. & Pat.App.1982) (emphasis in original). Where square bottles are involved, even if there are some advantages to their use, such as ease of shipping and consumption of less shelf space, those advantages alone do not render a design functional. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 21 (7th Cir.1992). If the same function can be performed by a bottle and cap of a different shape with no substantial sacrifice, there is no need to copy trade dress. *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 429 (5th Cir.1984).

Even where shape is the same, distinctive coloring or labeling may provide sufficient differences in packaging to avoid confusion. *See Freixenet S.A. v. Admiral Wine and Liquor Co.*, 731 F.2d 148, 151 (3d Cir.1984) (wine bottles).

### b. Secondary Meaning

In making a determination of secondary meaning, the factors to be considered are 1) plaintiff's advertising expenditures; 2) consumer surveys linking the trade dress to a particular source; 3) sales success; 4) unsolicited media coverage; 5) attempts to plagiarize the trade dress and; 6) the length and exclusivity of use. *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1536 (2d Cir.1992). No single factor is determinative. *Id.* The total packaging, not just the shape of the bottle, must be considered. *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 475 (3d Cir.1990).

Intentional copying is persuasive evidence of secondary meaning. *Le Sportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 78 (2d Cir.1985). *See also 20th Century Wear, Inc. v. Sanmark–Stardust, Inc.*, 815 F.2d 8, 9–10 (2d Cir.1987); *Time, Inc. Magazine Co. v. Globe Communications*, 712 F.Supp. 1103, 1108 (S.D.N.Y.1989).

Survey evidence is particularly useful in establishing secondary meaning. *See Le Sportsac*, 754 F.2d at 78 (generally, survey figures of over 50% are sufficient to prove secondary meaning); *Harlequin Enterprises, Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 (2d Cir.1981) (50% association probative of secondary meaning of book cover design); *RJR Foods, Inc. v. White Rock Corp.*, 201 U.S.P.Q. 578 (S.D.N.Y. 1978), *aff'd*, 603 F.2d 1058 (2d Cir.1979) (66% recognition probative of secondary meaning in trade dress design); J. Thomas McCarthy, *2 Trademarks and Unfair Competition*, § 32.54 at 786 (2d ed. 1984).

Survey questions should not be slanted or leading. *Id.* at § 32.50 at 776. Proper surveys may include both purchasers and users in the relevant universe. *See*

*e.g., Consumers Union of the United States v. New Regina Corp.,* 664 F.Supp. 753 (S.D.N.Y.1987); *Miles Laboratories v. Naturally Vitamin Supplements,* 1 U.S.P.Q.2d 1445, 1458 (TTAB 1986).

### c. Private Labeling

Sales with private labels may present a problem to a plaintiff attempting to prove secondary meaning. *See Century Time, Ltd. et al. v. Interchron, Ltd. et al.,* 729 F.Supp. 366, 368 n. 2 (S.D.N.Y.1990). *Tone Bros., Inc. v. Sysco Corp.,* 1992 WL 200128 1992 U.S.Dist. Lexis 10867 (S.D.Iowa 1992) (no secondary meaning where ninety percent of the plaintiff's sales were made under private labels). *But cf.,* finding secondary meaning where goods sold to private label accounts: *Yarmuth–Dion, Inc. v. D'Ion Furs, Inc.,* 835 F.2d 990 (2d Cir. 1987); *Littelfuse, Inc. v. Parker–Hannifin Corp.,* 230 U.S.P.Q. 654 (N.D.Ill.1986).

█ Where the overwhelming amount of sales are made under the main label and the plaintiff is not competing so adversely with its own product under different trade names as to dilute the inference of origin, secondary meaning is retained and there is no loss of Lanham Act protection. Any other rule would be devastating to producers who sell part of their product to private labellers, since so much consumer goods is produced by the same factories under different brand names. From pitted olives to washing machines, essentially identical products are often labelled by the same producer for different sellers.

### d. Likelihood of Confusion

█ The critical inquiry in a trademark infringement action is whether it is likely that an appreciable number of ordinary prudent purchasers will be confused about the source of the goods. *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). In deciding, the court will consider: 1) the strength of the mark; 2) the degree of similarity between the two marks; 3) the proximity of the marks; 4) actual confusion; 5) the defendant's good faith in

adopting the mark; 6) the quality of defendant's product and; 7) the sophistication of the buyers. *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

Even different labels on nearly identical bottles may cause confusion. *See Source Perrier S.A. v. Waters of Saratoga Springs, Inc.,* 217 U.S.P.Q. 617, 620 (S.D.N.Y.1982). The mere addition of a second mark, such as a label, may "not dissipate the confusion engendered though the use of the infringing mark." *Id.*

Confusion by purchasers is likely to be greater the cheaper the product, since less care may be taken in selection. *See e.g., Conopco, Inc. v. May Dep't Stores, Co.,* 784 F.Supp. 648, 678 (E.D.Mo.1992); *Sykes Laboratory, Inc. v. Kalvin,* 610 F.Supp. 849, 860 (C.D.Cal.1985) (little care is used in choosing a nail hardener).

Courts will infer a wrongful intent where the second comer "had freedom to choose any mark but just happened to choose a mark confusingly similar" to the senior user's. *Dreyfus Fund, Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1121 (S.D.N.Y.1981).

### D. Unclean Hands

To assert the doctrine of unclean hands, the wrongdoing must be "directly connected with the right sought to be vindicated ...; it does not outlaw the wrongdoer and leave him without protection in the vindication of other, though closely connected, rights." *Maatschappij Tot Exploitatie Van Rademaker's Koninklijke Cacao & Chocoladefadrieken v. Kosloff et al.,* 45 F.2d 94, 96 (2d Cir.1930); *see also Warner Bros. v. Gay Toys, Inc.,* 724 F.2d 327, 334 (2d Cir.1983).

### III. APPLICATION OF LAW TO FACTS

█ Plaintiff is entitled to preliminary relief. Irreparable injury may result from the loss of good will and from the confusion that is likely to result if defendants are permitted to enter the market with their identical bottle design.

Defendants' argument that plaintiff's nail polish bottle design is functional must fail. A vast number of bottle and cap

designs are currently used successfully for marketing nail polish. A nail polish bottle is not required to be square, with ridges at the bottom shoulder and a simple cylindrical cap.

The deprivation of use of the identical bottle and cap will not hinder defendants' ability to compete fairly in the marketplace. The functional advantages equivalent to plaintiff's bottle and cap could easily be obtained were the defendants to design their own nail polish container.

Essie's survey results provide ample evidence that her trade dress has acquired secondary meaning. The survey is not, as defendants claim, invalid. While it is permissible to include end-users in the relevant universe surveyed, the tabulation of the demographics of those who responded to the survey indicate that nearly eighty percent of the respondents had purchasing responsibility. There is no indication of the ethnicity of the respondents.

Nor was the initial question used in the survey leading. ("Who do you believe puts out this product?"). Questions similar to the one used by plaintiff have been approved as proper. See e.g., McDonald's Corp. v. McBagel's Inc., 649 F.Supp. 1268, 1277 (S.D.N.Y.1986) ("Though you may or may not have seen or heard of this restaurant, who do you believe sponsors or promotes McBagels?"); Wuv's International, Inc. v. Love's Enterprises, Inc., 208 U.S.P.Q. 736 (D.C.Colo.1980) ("What company or person do you believe owns or operates this restaurant?).

It is evident that defendants engaged in intentional copying in an attempt to cash in on plaintiff's success. Their use of the identical bottle, in light of the many different bottles available to them, coupled with the inconspicuous label, suggests bad faith. They are hoping to trade on Essie's good will and recognition.

Essie's limited private labeling activities do not negate a finding of secondary meaning. Her trade dress is, in effect, the absence of trade dress. She has deliberately marketed her bottle to focus on the colors of the nail polish and to permit salon owners, if they wish, to personalize the prod-

uct. The important factor is that her customers associate the trade dress in her bottle design with her alone. Decisions by a few salons to privately label the bottle have no effect on recognition among relevant consumers—nail salon owners and manicurists. In most instances of private labeling, the Essie label is not removed. Moreover, because the customer group that views the private label in the salon is the ultimate end-user, not the purchaser, Essie need not show secondary meaning for that group.

Not only has every element of the test for likelihood of confusion been met, but defendants have also intentionally replicated Essie's packaging. The two packaging designs are identical in every critical respect.

It is significant that Essie's bottle design is essentially labelless, at first glance, since the label is on the bottom. Defendants' design has inconspicuous, peel-off lettering on only one side of the bottle. There is a substantial probability that a purchaser would not notice defendants' mark "Cile" without careful inspection or that the label would be removed.

Many Korean-owned salons are staffed and owned by persons who speak little or no English. Pat Widder, Koreans Nail Down Share of New York's Manicures, Chic.Trib., Aug. 21, 1989, at Cl. To those not conversant with spoken or written English, defendants' additional mark "Cile" (pronounced "see-lay") may be similar in sight and sound to "Essie" (pronounced "ess-ee").

Defendants intend to compete head-to-head with Essie in identical markets in the New York area and nationwide. They admit they will be targeting Korean nail salons where ethnicity may already give them an advantage.

The balance of hardships swings heavily in Essie's favor. Defendants' business is devoted to products other than nail polish, whereas Essie's is almost entirely devoted to nail polish sales. Moreover, since Essie notified defendants before their bottle was produced that they ran the risk of a trade dress infringement claim, they bear the

risk of having gone forward with a mode of operation now being declared illegal.

Finally, defendants incorrectly invoke the doctrine of unclean hands in this case. Even if Essie has engaged in violations of federal labeling laws, which she vigorously denies, it would not serve as a bar to her invoking her valuable rights under the Lanham Act.

## IV. CONCLUSION

The motion for a preliminary injunction is granted. Defendants cannot be permitted to trade on plaintiff's extraordinary success in nail salons both nationally and in the local Korean market.

SO ORDERED